THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
RUSSELL MORRIS, Defendant-Appellant.

First District (4th Division) No. 1—89—0957

Opinion filed May 14, 1992.

Randolph N. Stone, Public Defender, of Chicago (Lisa S. Ottenfeld, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Veronica X. Calderon, and Catherine A. Hufford, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McMORROW delivered the opinion of the court:

Following a jury trial, defendant was convicted of armed robbery (Ill. Rev. Stat. 1985, ch. 38, par. 18—2(a)), residential burglary (Ill. Rev. Stat. 1985, ch. 38, par. 19—3(a)), possession of a stolen motor vehicle (Ill. Rev. Stat. 1985, ch. 95½, par. 4—103(a)(1)), and aggravated unlawful restraint. (Ill. Rev. Stat. 1985, ch. 38, par. 10—3.1(a).) He was sentenced to 25 years' imprisonment for the armed robbery conviction, as well as lesser, concurrent terms of incarceration for the remaining convictions.

On appeal, defendant asserts that he is entitled to a new trial because the court improperly excused the taking of *voir dire* by a court reporter. Defendant contends that his trial counsel was ineffective when he acquiesced in the court's excusal of court-reported transcription of jury selection.

In addition, defendant urges that his trial attorney was incompetent because he failed to: (a) file a motion to quash defendant's arrest and suppress his incriminating statements on the ground that defendant was arrested without probable cause; (b) object to the admission into evidence of the frame-of-mind testimony of the victims; and (c) file a motion *in limine* to exclude references to other crimes contained in defendant's incriminating statements.

Defendant also claims that the trial court erroneously excluded certain alibi witnesses tendered by the defense. He asserts that his trial counsel was incompetent because the attorney failed to timely locate and advise the court of his intention to call these alibi witnesses in defendant's defense at trial. Defendant further contends that he was deprived of a fair trial when the prosecution repeatedly asked defendant, during cross-examination of defendant, whether certain of the State's witnesses were lying.

Defendant also claims error in the trial court's responses to questions asked by the jury during its deliberation of the defendant's guilt. Defendant argues that his attorney provided inadequate legal representation when counsel acquiesced in the court's disposition of the notes sent by the jury during deliberations.

Defendant contends that cumulative error deprived him of a fair trial and that his armed robbery sentence was excessive.

We conclude that many of the grounds asserted by defendant were not error. We further determine that, in view of the substantial evidence of the defendant's guilt, the remaining alleged errors were not so prejudicial that he was deprived of a fair trial. Accordingly, we affirm defendant's convictions. Finding no abuse of discretion in the sentence imposed by the trial court, we similarly affirm defendant's 25-year sentence.

Defendant was convicted for the residential burglary and armed robbery of Dr. Theodore Handrup and his wife, Cynthia, that occurred in the City of Chicago on October 16, 1986. Dr. Handrup testified that on the date of the incident, he and his wife arrived at their apartment at approximately 8:20 to 8:30 p.m. Dr. Handrup stated that his wife entered the apartment door ahead of him. As Mrs. Handrup walked through the apartment, she looked into the library and said to Dr. Handrup, "My God. We have been robbed." Dr. Handrup walked toward the bedroom and noticed that the room was in disarray. At that moment, two men appeared behind Dr. Handrup. Both men were wearing jackets, ski masks, gloves, and were carrying guns. Dr. Handrup made an in-court identification of a blue jacket as that worn by the first assailant.

Dr. Handrup testified that the two assailants held the weapons to the Handrups' heads and that the first offender, who was wearing the blue jacket, began pushing the Handrups to the floor. This man then took Mrs. Handrup's jewelry from her person. Mrs. Handrup began to cry; the man wearing the blue jacket told her to stop crying because it was making him nervous. Dr. Handrup said that the man wearing the blue jacket asked him the value of the ring that his wife was wearing and how much money Dr. Handrup earned per hour. The man explained that his wife was pregnant and that they were committing the robbery because they needed the money. This assailant also said that the apartment was "an easy job to rob" and that the Handrups needed a burglar alarm.

Using rope produced from a duffel bag that they had been carrying, the man wearing the blue jacket bound the Handrups' hands, telling them that if they moved or screamed, they would be hurt. Dr. Handrup's rings, watch, and wallet were taken from his person. The couple were then led at gunpoint to the library closet, where they were forced to sit on the floor. Dr. Handrup testified that he tried to look at the other offender, *i.e.*, the one who did not speak to them during the incident, while Dr. Handrup was being led to the library. Dr. Handrup testified that the offender wearing the blue jacket told him not to look at the other assailant, and also said that if Dr. Han-

drup made eye contact with the second offender, Dr. Handrup would be hurt. Dr. Handrup testified that both he and his wife were forced to keep their eyes to the ground and that he was only able to glance briefly at the second assailant.

When the Handrups reached the library closet and were forced to sit on the floor, the man wearing the blue jacket tied their legs, gagged their mouths, and placed pillow cases over their heads. The Handrups were left in the locked closet.

Dr. Handrup stated at trial that the assailants returned to the closet to request the location of titles to the Handrups' automobiles. The Handrups had been able to remove the gags from their mouths, and the man wearing the blue jacket threatened them for having done so. Dr. Handrup testified that the men returned on at least five or six additional occasions, continuing their search for title registrations to the Handrups' vehicles and also asking how to cash traveler's checks found in the apartment. Dr. Handrup testified that each time the offenders left the library, they would push furniture up against the closet and lock the library door. Throughout the incident, the first assailant, wearing the blue jacket, was the only one who spoke. The second assailant never said anything in the Handrups' presence. Neither man ever removed his ski mask.

Dr. Handrup testified that he and his wife were released from the closet at approximately 1 to 1:30 a.m. by a Chicago police officer. Dr. Handrup stated that thereafter, he noticed that the garbage chute, which opened to the outside of the apartment, was completely knocked out. Both of the Handrups' cars were gone from the garage, although they were returned later by police officers. Dr. Handrup told authorities that the first assailant, who had spoken to them during the incident, had an unusual accent. He stated that he told the officers that he was not sure if the accent was European or eastern, but that the accent did not "sound Chicagoan."

Dr. Handrup testified that on the date of the incident, he knew an individual by the name of Heath Ross (Ross), whom Dr. Handrup had, in the past, hired to walk the dogs and wash his cars. Dr. Handrup testified that the evening before the robbery, he had seen Ross carrying a duffel bag similar to the one used during the incident. At the time Dr. Handrup saw Ross with the duffel bag, Ross was one block from the Handrups' apartment.

Dr. Handrup also testified that he and his wife went to the police station on October 19, 1986, to identify property being held at the station. While the Handrups were at the station house, Dr. Handrup noticed a young woman who had a number of Mrs. Handrup's posses-

sions. He informed the police of this, and the woman was taken into a room at the station house. Thereafter, authorities brought various items out of the room. Dr. Handrup stated that he and his wife identified all of these items as theirs, and that they had been removed during the robbery. Included among these items were Mrs. Handrup's purse, watch, jewelry, credit cards, wallet, and checkbook.

Dr. Handrup testified that while he was at the police station, he also observed a man, whom he referred to in court as the defendant, wearing Dr. Handrup's sweatshirt and Mrs. Handrup's jeans. Dr. Handrup stated that these items of clothing had also been taken during the robbery. Dr. Handrup testified that when defendant first saw him, defendant said, "Hello, Doctor." Dr. Handrup testified at trial that he recognized defendant's voice as that of the first assailant who had worn the blue jacket during the robbery.

Mrs. Handrup's account of the incident was substantially similar to that given by her husband. She also testified that the night before the robbery, when she had been in the apartment alone, there had been a knock at the rear service door, which was always locked and never used as access to the apartment. A man identified himself at the door as John, the janitor, and asked for admittance to fix some pipes. Mrs. Handrup stated that she did not recognize the voice to be that of the building janitor, that she knew no repairs were needed, and that she refused to allow the man access to the apartment.

Detective Robert O'Leary of the Chicago police department testified that he investigated the incident and had a conversation with Ross on October 18, 1986. Ross informed the detective that Ross had seen defendant a few days earlier. At that time, defendant was in possession of two automobiles that matched the description of the Handrups' vehicles. Ross informed Detective O'Leary that Ross had seen the defendant at Robert Reyes' home, on Oakdale in Chicago, and the officer went to that address on October 19, 1986. Defendant was at the residence and agreed to accompany Detective O'Leary to a station house to aid the officer's investigation. At approximately 10 a.m., upon their arrival at the police station, defendant was placed in an interview room. Detective O'Leary advised defendant of his *Miranda* rights, which defendant indicated he understood.

Detective O'Leary informed defendant that he was investigating the Handrup robbery. Defendant denied any participation in the incident and said that on the night of the robbery he had been with his girl friend, Evelyn Rodriguez, at her sister's house. The detectives left defendant alone in the interview room, placing him in handcuffs, to check defendant's alibi. The detectives were not able to confirm

defendant's explanation of his whereabouts and had a second conversation with defendant at approximately noon. Defendant's handcuffs were removed, and he was again advised of and stated that he understood his *Miranda* rights. Detective O'Leary informed defendant that Ross had said that Ross had seen defendant in possession of the stolen motor vehicles. Although defendant initially said that Ross was lying, defendant then admitted to his participation in the robbery and informed Detective O'Leary that Ross had been the second offender. Detective O'Leary testified that when Ross was later confronted with defendant's statement, Ross admitted his participation in the incident.

In his oral confession to Detective O'Leary, defendant said that he had discussed his financial problems with Ross on October 15, 1986. Defendant told Ross that defendant had been arrested for auto theft and had an upcoming court date. Defendant also told Ross that defendant had spoken to an attorney, who had advised defendant that attorney fees would cost approximately $2,500 to $5,000. The lawyer also told defendant that he could expect probation for the auto theft charge if he were represented by counsel, but that without legal representation defendant could receive up to two years' imprisonment.

Detective O'Leary testified that defendant told the detective that he and Ross had decided to rob the Handrups' apartment. Defendant and Ross met outside the Handrups' building on October 16. Ross had a blue and white duffel bag and a 9 mm. blank gun. In the duffel bag, Ross had a rope, ski mask, and gloves. Defendant had a .38 revolver.

Defendant told Detective O'Leary that defendant and Ross broke into the Handrups' apartment through the garbage chute and collected various items from the residence. They decided to wait for the Handrups' return to the apartment in order to take whatever money they might have. Defendant stated to the officer that defendant and Ross put on ski masks and wore their gloves. Defendant said that he was wearing a blue jacket. When the Handrups arrived, defendant and Ross accosted them and forced them to lie down, at gunpoint, while defendant and Ross took their jewelry and money. The defendant and Ross then tied and gagged the Handrups, and put them in a closet. Defendant and Ross put various items in the Handrups' automobiles, located in the garage, and left the residence in the Handrups' vehicles. The pair drove to the home of Robert Reyes, in Chicago.

Detective O'Leary stated at trial that after his oral inculpatory statements, defendant agreed to accompany the detective to Reyes' house, where the Handrups' property was recovered. The detective stated that the items were taken to the station house, where they were identified by the Handrups. A blue jacket was found in the suit-

cases recovered from Reyes' residence, as well as two guns, ammunition, a ski mask, and gloves. Defendant identified these items as his and told the detective that he had worn the jacket, ski mask, and gloves during the robbery. Detective O'Leary also testified that Mrs. Handrup's watch, ring, purse, wallet, checkbook and credit cards were recovered from defendant's girl friend, Evelyn Rodriguez, while Rodriguez was at the police station on October 19. Detective O'Leary stated that these items were recovered from Rodriguez after the Handrups noticed that Rodriguez was wearing the items and informed authorities that the things belonged to Mrs. Handrup.

Assistant State's Attorney Michael Sherwin testified that defendant made an oral incriminating statement to him on October 19, 1986, while at the police station house. Defendant made this statement following his waiver of *Miranda* rights, during an interview that began at approximately 7:30 p.m. In his statement, defendant told the assistant State's Attorney that he had needed the money from the robbery for legal fees relating to an auto theft charge he was facing. Defendant admitted to breaking into the Handrups' apartment through the garbage chute and acknowledged that both he and Ross had guns during the incident. Defendant told the assistant State's Attorney that the Handrups were tied up and put in a closet while he and Ross continued to search the apartment for items to take. Defendant also informed the assistant State's Attorney that he and Ross had taken the Handrups' automobiles and that he had given a number of the stolen items to his girl friend, Evelyn Rodriguez. Although defendant initially agreed to sign a written account of the incident, he later refused to sign anything reduced to writing.

Defendant testified in his own defense at trial. He stated that on the night of the incident, he was with John McFarland, Robert Reyes, and his girl friend, Evelyn. When Evelyn left at approximately 8:15 p.m., defendant went to the home of his friend, Eddie Veizaga, where he stayed until approximately 12:15 a.m. to 12:20 a.m. Defendant testified that he then drove to the residence of Reyes, where he spent the night. Defendant said that when he arrived at Reyes' house, Ross was coming out of the home. Defendant testified that Reyes was yelling something about Ross moving some items into the home.

Defendant testified at trial that police arrived at the Reyes residence on October 19, 1986, and awoke defendant at approximately 8:35 a.m. They forcibly took him to the police station house, where he was handcuffed. Defendant said that he refused to speak to the officers. He stated that later that evening, the officers drove him to Reyes' house. The officers went into the home, but took nothing from

the house when they later came out and left the residence. Defendant testified that he was repeatedly beaten by the officers and that he did not tell the officers that he had been involved in the robbery. Defendant said that he also refused to talk to the assistant State's Attorney, who attempted to force defendant to sign a written statement, which defendant refused to do. Defendant acknowledged that he had given gifts to his girl friend, Evelyn, but stated that he had obtained them from Ross.

Defendant also testified that he did not know Dr. Handrup. He said that he saw Dr. Handrup at the police station on two occasions on October 19, while he was being held by the detectives. On the first occasion, defendant was sitting in an interview room, and the officers opened the door and pointed out the defendant to Dr. Handrup, saying that defendant had been one of the assailants. On his second encounter with Dr. Handrup, which occurred outside the interview room, defendant told Dr. Handrup that defendant had not committed the robbery. According to defendant, Dr. Handrup responded that he believed the defendant.

Thereafter, the jury returned verdicts finding the defendant guilty of armed robbery, residential burglary, armed violence, aggravated unlawful restraint, and possession of stolen motor vehicles. The jury found the defendant not guilty on the charges of theft of the Handrups' automobiles. The trial court denied defendant's post-trial motion for a new trial. Following a sentencing hearing, the trial court imposed a 25-year sentence for the armed robbery conviction, as well as lesser, concurrent terms of imprisonment for the remaining convictions. He now appeals. We consider defendant's arguments according to the chronology of the proceedings before the trial court.

### I. EXCUSAL OF COURT REPORTING FOR *VOIR DIRE*

Defendant claims that the trial court committed reversible error when it permitted jury selection to take place without transcription by a court reporter. Defendant also contends that his trial counsel was ineffective when he acquiesced in the court's request that the parties waive court reporting of jury selection.

The record indicates that on the first day of defendant's trial, the court began jury selection. Twelve prospective jurors were called, and the court advised these individuals of the persons involved in the case as well as the identities of court personnel and counsel appearing in court. The court then asked defense counsel and the prosecutor to step forward to the bench and stated the following to the attorneys:

"The court reporter informed me she has an appointment with her doctor. Would you please excuse her for the impaneling of the jurors? Before doing that would all of the perspective [*sic*] jurors raise their right hands please.

(WHEREUPON THE JURORS
WERE SWORN IN.)

THE COURT: Ms. Reporter, you are excused."

According to the transcript, the court reporter was then excused for *voir dire*. The record reflects that court reporting was thereafter resumed for opening statements by the State and defense counsel, as well as for the remainder of defendant's trial.

Defendant contends that the trial court's request to waive court reporting was in error, because stenographic transcription of jury selection is mandated in Illinois Supreme Court Rule 608. (134 Ill. 2d R. 608.) This rule sets forth the required contents of the record in an appeal from a criminal conviction. With respect to transcripts, Rule 608 states that the record on appeal must contain the transcript of the proceedings at the defendant's arraignment and plea (134 Ill. 2d R. 608(a)(4); see also 134 Ill. 2d R. 402(e) (when defendant pleads guilty, "the proceedings *** shall be taken verbatim, and upon order of the trial court transcribed, filed, and made a part of the common law record")), a transcript of the proceedings regarding waiver of counsel and waiver of jury trial, if either was waived (134 Ill. 2d R. 608(a)(7); see also 134 Ill. 2d R. 401(b) (defendant's waiver of right to counsel "shall be taken verbatim, and upon order of the trial court transcribed, filed and made a part of the common law record")), a report of the trial proceedings (134 Ill. 2d R. 608(a)(8)), and a transcript of proceedings at defendant's sentencing hearing (134 Ill. 2d R. 608(a)(13)). In cases in which the death penalty is not imposed, Rule 608(a)(9) states that "the court reporter shall take full stenographic notes of the proceedings regarding the selection of the jury, but the notes need not be transcribed unless a party designates that such proceedings be included in the record on appeal." 134 Ill. 2d R. 608(a)(9).

In addition to these provisions in supreme court rules regarding transcripts in criminal proceedings, Rule 612 states that the supreme court's rules regarding civil appeals apply, as appropriate, to criminal matters. (134 Ill. 2d R. 612.) Rule 612(c) permits application of Illinois Supreme Court Rules 323(c) and (d) regarding the procedure to be followed if no verbatim transcript is available (*i.e.*, a bystander's report) and if the parties are able to agree to a stipulated statement of facts. See 134 Ill. 2d Rules 323(c), (d).

■ It has been held that a trial court's failure to provide a court reporter during jury selection does not deprive the defendant of due process. In *People v. McClurg* (1990), 195 Ill. App. 3d 381, 388, 552 N.E.2d 290, the trial court advised the defendant that "there were not enough court reporters to make one available during jury selection." Defendant was informed by the trial court that a court reporter would be available at a later time to preserve a record. In rejecting the defendant's due process argument upon review, the court stated:

> "The defendant recognizes that it is her duty, as appellant, to provide the reviewing court with a record of proceedings. She argues, however, that the failure to provide a court reporter deprived her of the ability to preserve her objections for review. This simply is not so. The Illinois Supreme Court rules clearly provide alternative methods for preserving the record where no verbatim transcript is available. (107 Ill. 2d Rules 323(c), (d).) Defendant submitted neither a bystander's report nor agreed statement of facts. Therefore, defendant has waived any argument concerning the sufficiency of the record and the propriety of the trial court's rulings during *voir dire*. [Citation.]" *McClurg*, 195 Ill. App. 3d at 388.

In light of this precedent, we are not persuaded by defendant's argument regarding the trial court's excusal of court reporting of *voir dire*. As in *McClurg*, the defendant in the instant cause claims that the failure to provide a court reporter renders him unable to raise any objections to *voir dire*. However, the infirmity of which the defendant complains has resulted because defendant has not obtained a bystander's report or an agreed statement of facts, as permitted under Rules 612 and 323. Accordingly, defendant cannot now urge that the court's ruling was reversible error.

Defendant also argues that his attorney was ineffective because he should not have agreed to excuse the taking of *voir dire* by a court reporter.

In order to show that he is entitled to a new trial because his attorney was ineffective, a defendant must demonstrate that his counsel's performance "fell below an objective standard of reasonableness," and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland v. Washington* (1984), 466 U.S. 668, 688, 694, 80 L. Ed. 2d 674, 693, 698, 104 S. Ct. 2052, 2064, 2068; see also *People v. Albanese* (1984), 104 Ill. 2d 504, 526, 473 N.E.2d 1246.) There is a "strong presumption" that the performance of the defendant's attorney fell within the range of reasonably adequate represen-

tation, and the defendant must establish "not simply a possibility of prejudice, but that the claimed error worked to his actual and substantial disadvantage." (*People v. Owens* (1989), 129 Ill. 2d 303, 318, 544 N.E.2d 276.) A defendant is not entitled to a perfect trial, but to a fair one, and an attorney is not ineffective simply because the defendant was not acquitted of the charges for which he was standing trial. *People v. Szabo* (1991), 144 Ill. 2d 525, 531, 582 N.E.2d 173.

■ It has been held that a defense counsel's failure to obtain the presence of a court reporter for *voir dire* does not create a *per se* presumption of ineffective assistance of counsel. (*People v. Thompkins* (1988), 121 Ill. 2d 401, 448, 521 N.E.2d 38.) To prevail on his claim that his attorney was ineffective in this regard, defendant must point to some error in selection of the jury. (See *People v. Long* (1990), 208 Ill. App. 3d 627, 641, 567 N.E.2d 514.) It was incumbent upon the defendant, as appellant, to obtain a bystander's report, or stipulated statement of facts, in lieu of a verbatim transcript of the *voir dire*. (See *People v. McClurg* (1990), 195 Ill. App. 3d 381, 552 N.E.2d 290.) Since the defendant is unable to specify any particular error that occurred during jury selection and has failed to procure a bystander's report or stipulated statement of facts regarding jury selection, we find his argument on this point insufficient basis to award him a new trial.

### II. DEFENSE COUNSEL'S FAILURE TO FILE MOTION TO QUASH AND SUPPRESS

Defendant contends that his trial counsel was ineffective because he failed to file a motion to quash his arrest and suppress his incriminating statements on the ground that defendant was arrested without probable cause.

The question of whether to file a motion to quash or suppress is traditionally considered a matter of trial strategy, an area left to trial counsel's discretionary judgment, and therefore one in which the court will not indulge a hindsight analysis to determine whether the attorney's decision was reasonably adequate under the circumstances. (*People v. Bryant* (1989), 128 Ill. 2d 448, 458-59, 539 N.E.2d 1221.) To prevail on a claim that his trial counsel was ineffective for failing to file a motion to quash and suppress, the defendant must show that the motion would have been granted and that the trial outcome would have been different if the evidence had been suppressed. *People v. Bennett* (1991), 222 Ill. App. 3d 188, 201, 582 N.E.2d 1370; *People v. Mendez* (1991), 221 Ill. App. 3d 868, 873, 582 N.E.2d 1265.

Defendant contends that his attorney exercised such poor judgment on this point that it should be held ineffective assistance of counsel, since the question of whether defendant was arrested without probable cause was a close one that should have been submitted for the trial court's factual resolution. To support this argument, defendant cites to *People v. Stewart* (1991), 217 Ill. App. 3d 373, 577 N.E.2d 175. In *Stewart*, the court reversed the defendant's conviction and remanded the cause for a hearing on the issue of whether there was probable cause to arrest, where the defendant claimed that his trial counsel was ineffective for failing to file a motion to quash and the record revealed a "close" factual question on the issue of probable cause. Defendant claims that he was under arrest when he accompanied authorities from the Reyes residence to the station house. We will assume *arguendo*, and solely for the purpose of resolving defendant's argument in this appeal, that defendant was arrested when he was first driven to the police station by Detective O'Leary.

Probable cause is defined as facts and circumstances that would prompt a reasonable person to believe that an offense has been committed and that the accused committed the offense. (*People v. Tisler* (1984), 103 Ill. 2d 226, 469 N.E.2d 147.) Defendant notes that the police officers in the instant cause relied upon information learned from Ross in order to arrest the defendant. Defendant asserts that the officers could not reasonably rely on the veracity of Ross' statements in order to find probable cause to arrest defendant, because Ross had every reason to exculpate himself and shift blame for the incident to defendant.

In Illinois, information received by the police from third parties must be justified by some indicia of reliability in order to establish probable cause. (*People v. James* (1987), 118 Ill. 2d 214, 222, 514 N.E.2d 998.) In *People v. Adams* (1989), 131 Ill. 2d 387, 546 N.E.2d 561, the Illinois Supreme Court rejected a rigid distinction between the reliability of a paid informant and the reliability of an ordinary citizen. (131 Ill. 2d at 396-98.) The court determined that, regardless of whether the information learned by the authorities was provided voluntarily by a citizen or upon payment to an informant, the primary inquiry is whether "the information, taken in its totality, and interpreted not by technical legal rules but by factual and practical commonsense considerations, would lead a reasonable and prudent person to believe that the person stopped had committed an offense. [Citation.]" 131 Ill. 2d at 396-97; see also *People v. Mackey* (1990), 207 Ill. App. 3d 839, 858-59, 566 N.E.2d 449; *People v. Jones* (1990), 196 Ill. App. 3d 937, 955-56, 554 N.E.2d 516.

■ Under the totality of the circumstances appearing to the officers, as shown in the record before us, we cannot agree with defendant's argument that his trial counsel should have argued, at a hearing on a motion to suppress for lack of probable cause, that Ross' statements to authorities were unreliable and thus insufficient to establish probable cause. According to the trial testimony of Officer O'Leary, Ross informed the officers on Saturday, October 18, that Ross had recently seen defendant in the possession of certain automobiles. Ross' description of the vehicles matched that of the Handrups' cars. Ross informed the detectives where the automobiles could be located. Ross also advised the detectives where defendant could be found, *i.e.*, at Reyes' residence, and defendant was found at that address.

The record also reflects that at the time Ross provided the information to the officers, Ross had not yet been arrested for his involvement in the Handrup robbery. Consequently, Ross was not an arrestee when he informed the officers that he had seen defendant with vehicles that matched the description of the Handrups' automobiles. Also, there is nothing in the record to indicate that Ross was paid for the information he gave to the officers. Although Ross later proved to be involved in the incident, he had little to gain by providing the officers with utterly false information "for, once the falsehood was discovered, he would have to suffer the consequences of misleading the police." (*People v. James* (1987), 118 Ill. 2d 214, 224, 514 N.E.2d 998.) We cannot say, on this record, that the question of probable cause would have been a close one for the trial court's factual resolution. (See *People v. Stewart* (1991), 217 Ill. App. 3d 373, 577 N.E.2d 175.) Consequently, we are not persuaded that it was ineffective assistance of counsel for defendant's attorney to choose not to file a motion to quash his arrest and suppress his incriminating statements for lack of probable cause to arrest.

### III. DEFENSE COUNSEL'S FAILURE TO OBJECT TO VICTIMS' FRAME-OF-MIND TESTIMONY

Defendant asserts that his trial attorney was incompetent because he failed to object to the admission into evidence of the frame-of-mind testimony of Dr. Handrup and his wife.

According to the record, Dr. Handrup testified that, during the robbery, Dr. Handrup attempted to calm his wife so she would stop crying, because Dr. Handrup was afraid that the man wearing the blue jacket "would kill" them. Defense counsel's objection to this testimony was overruled. Dr. Handrup also testified that during the incident, he was fearful that he or his wife would be killed because "it

was at the time of all those hijackings. They were always taking someone off to the front cabin, they were killed." Later, Dr. Handrup stated, when asked how much time elapsed between the moment when he and his wife were first placed in the closet and the occasion of the offenders' first return to the closet:

> "That's difficult, I mean, one has to understand the circumstances. We were terrorized. And, also, when they came back, we thought they were going to kill us. We interrupted a robbery. They got caught. And they left. Why would they come back? We were in a dark closet with no light, where there is a refrigerator pumping heat, no watches because our watches had already been stolen."

Defendant's attorney did not object to this testimony.

The record indicates that Mrs. Handrup also testified that "[w]hat was so terrifying, we would always think that they were gone from the apartment, then they would come back." Defense counsel did not object to this statement.

■ We need not and do not consider whether defendant's attorney should have objected to this testimony on the ground that it was irrelevant. Even assuming *arguendo* that such an objection would have been properly sustained by the trial court, we are unable to conclude that exclusion of this testimony would have materially altered the jury's verdict in the instant cause. See, *e.g., People v. Coleman* (1991), 222 Ill. App. 3d 614, 625, 584 N.E.2d 330.

The State presented substantial evidence of the defendant's guilt. According to State witnesses, defendant gave two incriminating statements to authorities with respect to his involvement in the Handrup robbery. These statements corroborated the testimony given by the Handrups regarding the incident. Defendant identified for police those items that he had used during the robbery, as well as proceeds defendant had taken from the Handrups' residence. Dr. Handrup stated at trial that he recognized defendant's voice as that of the assailant who spoke during the incident. In view of this substantial evidence of the defendant's guilt, we are unable to find that the challenged testimony substantially contributed to the jury's verdict. Consequently, defense counsel's alleged ineffective assistance in this respect did not deprive defendant of a fair trial.

### IV. DEFENSE COUNSEL'S FAILURE TO FILE *IN LIMINE* MOTION TO EXCLUDE REFERENCE TO OTHER CRIMES

Defendant argues that his attorney was ineffective when he failed to file a motion *in limine* to exclude references to other crimes that

were contained in defendant's incriminating statements to authorities. Specifically, defendant asserts that counsel should have motioned the court to delete the remark, in defendant's statements, that defendant needed money from the robbery to defray attorney fees for an auto theft charge that had been filed against defendant.

We note that the record reflects that, after Detective O'Leary testified to these aspects of the defendant's incriminating statement, defense counsel did object to the testimony on the ground that it was highly prejudicial. The trial court responded that it found the evidence probative and observed that it would have denied a motion *in limine* to exclude these references, even if such a motion had been timely made.

■ We are unable to accept defendant's claim that his trial attorney should have filed a motion *in limine* to delete defendant's references to a pending criminal charge. Evidence of other crimes or bad acts of the accused is admissible to prove his motive in committing the crime for which he is being prosecuted. (See, *e.g., People v. McCarthy* (1989), 132 Ill. 2d 331, 547 N.E.2d 459.) In the instant cause, defendant's remarks that he had committed the Handrup robbery because he needed funds for legal defense of a pending criminal charge explained defendant's motive for the robbery and were thus admissible.

Defendant asserts that this evidence was not admissible, because the State failed to show that the auto theft had actually been committed or that defendant committed that crime. It has been held that, in order for other crimes evidence to be admissible, it must first be shown that the other crime was actually committed and that the defendant committed it or participated in its commission. See, *e.g., People v. Thingvold* (1991), 145 Ill. 2d 441, 455-56, 584 N.E.2d 89.

The "other crimes" evidence in the case at bar was not defendant's commission of an auto theft. The other crimes evidence at issue here was simply that defendant had been charged with the commission of such an offense. Consequently, it was necessary for the State to show that the defendant had been charged with the criminal offense of auto theft and that this charge was pending against defendant at the time of the Handrup robbery. Proof of such a pending criminal charge was presented in defendant's incriminating statements themselves. Further evidence thereof by the State would have only served to highlight to the jury the circumstance that defendant had a pending criminal charge against him, thus prejudicing the defendant. Moreover, such proof would have served to verify an aspect of the defendant's incriminating statements to authorities—statements

which, according to defendant's trial testimony, defendant never made. We cannot fault defense counsel for his failure to make an argument that could have permitted the State to present evidence that would have only further prejudiced the defendant at trial.

In light of these considerations, we are not persuaded that defendant's counsel was ineffective for his failure to file a motion *in limine* to exclude references to other criminal charges contained in defendant's inculpatory statements to authorities.

### V. EXCLUSION OF ALIBI WITNESSES

Defendant asserts that the trial court committed reversible error when it denied his counsel the opportunity to present testimony from alibi witnesses. Defendant also claims that his trial attorney was ineffective because he failed to timely investigate, locate and disclose these alibi witnesses prior to trial.

The record reveals the following with respect to defendant's arguments on this issue. Defendant's trial counsel called two witnesses, Robert Reyes and defendant's mother, Helene Morris, to testify in defendant's behalf at the pretrial hearing on defendant's motion to suppress his incriminating statements on the ground that they were involuntary. Both of these persons gave testimony pertaining to defendant's physical condition during or after defendant's questioning by authorities.

Thereafter, at the commencement of defendant's trial and immediately prior to jury selection, defense counsel requested a continuance because the defendant was ill and could not appear in court. Defendant's attorney also requested that trial be reset because two key defense witnesses were unavailable. Counsel explained to the court that one of these persons, Robert Reyes, was out of town and the other, Evelyn Rodriguez, had moved and could not be located. The trial court denied the motion for a continuance. The court reasoned that defendant had apparently not filed an answer to the State's discovery request, and that as a result, defendant's proffered alibi defense was not of record and the names of his witnesses had not been disclosed to the State.

Following the State's presentation of its evidence, the court inquired into defense counsel's intentions with respect to the defendant's case. Defense counsel responded that he had one witness, Jamie Sweat (Sweat), whom he was "waiting on." The prosecutor noted that this witness' name did not appear on any answer to discovery filed by the defendant, and defense counsel explained that he had "just learned about" the witness "yesterday" from the defendant's mother.

Defendant's attorney stated that he did not know how long defendant's mother had been aware that Sweat could give testimony favorable to defendant's case at trial.

The trial court conducted an examination of the witness outside the presence of the jury. Sweat testified that he had known defendant as a friend for approximately three years and would see defendant in the neighborhood once or twice a week. Sweat informed the court that he had last seen the defendant on October 16, 1986, while defendant was eating at a hot dog stand in the neighborhood. Sweat stated that he could remember the date because on approximately October 27, 1986, Sweat had spoken to defendant's sister, who had asked Sweat when he had last seen the defendant.

Sweat advised the trial court during the examination that defendant's sister had come to him three weeks ago and had asked that he testify in defendant's behalf. Sweat acknowledged that he had dated defendant's sister, but explained that they had broken off the relationship. Sweat stated that he made an effort to stay in contact with defendant's sister because he (Sweat) was godfather to the sister's son. Sweat also testified to the court that he had seen defendant's mother 2½ weeks before his court appearance, and that he had seen defendant's sister four days before he came to testify in court. Although Sweat testified that he had never been arrested, he later admitted that he had been arrested for disorderly conduct.

The trial court refused to allow Sweat to testify in defendant's behalf at the trial, noting *inter alia* that defendant had not provided the name of this witness to the State during pretrial discovery.

Defense counsel then informed the court of another individual, Eddie Veizaga (Veizaga), whom he intended to call as a witness on behalf of the defendant. Defendant's attorney explained to the court that he had also learned of this witness only a day earlier from defendant's mother. Counsel offered to the court that he had conducted an "extensive investigation" under the circumstances, but that he was a solo practitioner, "[t]here is not all kinds of money," and defendant's parents had insufficient funds to hire a private investigator. The court recessed the matter to the following day to permit defendant the opportunity to present this witness in court.

The following morning, Veizaga appeared in court and was examined by the trial judge outside the presence of the jury. Veizaga testified that he had known the defendant, and the defendant's mother, for approximately eight years. He had last seen defendant's mother approximately three or four days earlier, and also saw her that morn-

ing outside the courtroom. Veizaga stated that he had just met defense counsel that morning.

Veizaga informed the court that he had been with defendant on October 16, 1986, the night of the incident, from approximately 9 p.m. until after midnight. Veizaga said that defendant had helped him repair his automobile, which was not working. Veizaga stated that he could remember the precise date that this had occurred, because he had had to take the day off from work to fix his car and had asked defendant to help him.

The trial court refused to allow Veizaga to testify on defendant's behalf, for the same reasons previously given to exclude the testimony of Jamie Sweat.

Defense counsel then informed the court that he wished to call defendant's mother. The trial court observed that this witness also had not been listed in pretrial discovery, and asked to what defendant's mother would testify. Counsel responded that she "would indicate that when she first saw the defendant after the occurrence that she [sic] had marks and bruises all over his face, and she would indicate he never owned a blue jacket." The trial court refused to allow the defendant's mother to testify. The defendant's attorney then called defendant to testify on his own behalf.

We consider first defendant's claim that the trial court committed reversible error in excluding the testimony of Sweat, Veizaga, and defendant's mother. Illinois Supreme Court Rule 413 requires that a defendant reveal, prior to trial, that he intends to rely upon the defense of alibi, and that the defendant disclose the names and addresses of persons he intends to call as witnesses. (134 Ill. 2d R. 413(d).) In addition, under Rule 415, a defendant has a continuing duty to disclose new alibi witnesses, including those discovered during the course of the trial. (134 Ill. 2d R. 415(b).) Rule 415 further provides that, if the court determines that a defendant has failed to satisfy these burdens of timely disclosure, the court may order disclosure of the witnesses, grant a continuance, exclude the testimony, or enter such other order as it deems just. 134 Ill. 2d R. 415(g).

Exclusion of alibi testimony has been recognized as an appropriate exercise of the trial court's discretionary authority under Rule 415(g). (See, e.g., People v. Partee (1987), 157 Ill. App. 3d 231, 252-53, 511 N.E.2d 1165.) The Illinois Supreme Court has found no abuse of discretion in a trial court's preclusion of alibi testimony (People v. Morgan (1991), 142 Ill. 2d 410, 568 N.E.2d 755, cert. granted (1991), 502 U.S. ___, 116 L. Ed. 2d 239, 112 S. Ct. 295), relying upon the fol-

lowing reasoning of the United States Supreme Court in *Taylor v. Illinois* (1988), 484 U.S. 400, 98 L. Ed. 2d 798, 108 S. Ct. 646:

" 'One of the purposes of the discovery rule itself is to minimize the risk that fabricated testimony will be believed. Defendants who are willing to fabricate a defense may also be willing to fabricate excuses for failing to comply with a discovery requirement. The risk of a contempt violation may seem trivial to a defendant facing the threat of imprisonment for a term of years. A dishonest client can mislead an honest attorney, and there are occasions when an attorney assumes that the duty of loyalty to the client outweighs elementary obligations to the court.' " *Morgan*, 142 Ill. 2d at 450-51, quoting *Taylor*, 484 U.S. at 413-14, 98 L. Ed. 2d at 813, 108 S. Ct. at 655.

█ In light of this precedent, we can find no abuse of discretion in the trial court's exclusion of the testimony of Sweat, Veizaga, or defendant's mother. The record in the case before us reveals that it was not until midtrial that these witnesses were brought to the attention of the prosecutor or the court. There is nothing in the instant record to provide adequate explanation for the absence of prior disclosure that these witnesses could give alibi testimony on defendant's behalf. In view of the personal ties between defendant and these witnesses, and their testimony during court examination, the trial court could have reasonably perceived that the witnesses' testimony represented a belated effort to provide exonerating evidence on the defendant's behalf. Given these considerations, we are unable to conclude that the trial court's exclusion of their testimony amounted to an abuse of discretion.

█ Defendant claims that his trial attorney was ineffective because he failed to timely locate and disclose the alibi testimony that could be provided by Sweat, Veizaga, and defendant's mother. An attorney is ineffective when he fails to investigate exculpatory witnesses who are known to the attorney. (*People v. Greer* (1980), 79 Ill. 2d 103, 123, 402 N.E.2d 203; see also *People v. Skinner* (1991), 220 Ill. App. 3d 479, 581 N.E.2d 252; *People v. O'Banner* (1991), 215 Ill. App. 3d 778, 575 N.E.2d 1261 (ineffective assistance when defense counsel fails to call known witnesses who would support an otherwise uncorroborated defense).) The record reflects that defense counsel did not discover until midtrial that Sweat, Veizaga, or defendant's mother could provide exculpatory testimony in defendant's behalf.

Defendant characterizes the record as indicating that defense counsel neglected to communicate with defendant and his family regarding his alibi defense. Defendant contends that his trial attorney

would have known prior to trial that these witnesses were available to provide alibi testimony, if the attorney had properly investigated his defense and spoken to these witnesses before his trial began. However, there is no evidence in the record to show the extent of investigation undertaken by defendant's attorney prior to trial, nor does the record disclose the full extent of defense counsel's pretrial communications with defendant and defendant's family with respect to the evidence to be presented in defendant's behalf at trial.

Where the disposition of a defendant's ineffective assistance of counsel claim requires consideration of matters beyond the record on direct appeal, it is more appropriate that the defendant's contentions be addressed in a proceeding for post-conviction relief (Ill. Rev. Stat. 1989, ch. 38, pars. 122–1 through 122–8), and the appellate court may properly decline to adjudicate the defendant's claim in his direct appeal from his criminal conviction. (*People v. Gilbert* (1992), 224 Ill. App. 3d 624, 632-33, 586 N.E.2d 1308; *People v. Kunze* (1990), 193 Ill. App. 3d 708, 725-26, 550 N.E.2d 284.) In light of these principles, we decline to address the merits of defendant's argument that his trial counsel was ineffective for a failure to investigate alibi witnesses. A disposition of defendant's claim requires consideration of matters *dehors* the record before us in this direct appeal, *viz.*, whether trial counsel failed to communicate with defendant and his family with respect to the witnesses to be called as alibi witnesses at trial. Defendant's claim on this point is more properly addressed in a proceeding for post-conviction relief, where a complete record can be made regarding defendant's allegations in this regard.

Similarly, we decline to address, in this direct appeal, defendant's claim that his trial counsel's errors deprived him of the opportunity to call Robert Reyes and Evelyn Rodriguez in defendant's behalf. Resolution of this claim also requires consideration of matters not established in the record in this appeal and is therefore more properly presented in a petition for post-conviction relief.

To support his ineffective assistance of counsel argument on this issue, defendant notes that on the first day of trial, the defense attorney requested a continuance so that he could locate these witnesses. Defense counsel informed the court that he could not obtain the presence of these witnesses at trial because Reyes was out of town and Rodriguez had moved and could not be located.

It has been recognized that a court "cannot fault defense counsel for failing to pursue a witness who was apparently unavailable" (*People v. Williams* (1991), 147 Ill. 2d 173, 247) where the defendant's attorney in the exercise of reasonable diligence was unable to locate the

witness to testify at trial. However, the record in the case at bar does not disclose the efforts undertaken by defense counsel to secure the presence of Reyes or Rodriguez in order to provide testimony in defendant's behalf at trial.

In addition, there is nothing in the record to show that Reyes or Rodriguez would have provided alibi testimony favorable to the defendant. To support his claim that Reyes and Rodriguez would have testified favorably at trial, the record must contain the substance of these witnesses' excluded testimony. Absent an offer of proof showing to what the witnesses would have testified, there is no evidentiary basis to support defendant's argument. See *People v. Mendez* (1991), 221 Ill. App. 3d 868, 873, 582 N.E.2d 1265; *People v. Barr* (1990), 200 Ill. App. 3d 1077, 1080, 558 N.E.2d 778.

We note that the testimony of Robert Reyes at the hearing on defendant's motion to suppress contains no alibi testimony. Reyes testified at the motion to suppress hearing that he waited during the day of October 19, 1986, while defendant was being held by the officers. Reyes said that he heard defendant screaming from the interview room off and on throughout much of the day. When Reyes saw defendant, at approximately 3 or 4 p.m. that afternoon, defendant's face was red and defendant was crying.

In light of all of these circumstances, we decline to address, in this direct appeal from his criminal convictions, the defendant's claims that his trial attorney was incompetent for his failure to call certain defense witnesses in defendant's behalf at trial.

### VI. QUESTIONING OF DEFENDANT DURING CROSS-EXAMINATION

Defendant contends that he was deprived of a fair trial when the prosecution repeatedly asked him, during cross-examination, whether certain of the State's witnesses were lying.

The record indicates that during cross-examination of the defendant, the State questioned defendant regarding his encounter with Dr. Handrup at the police station a few days after the armed robbery. The prosecution asked defendant whether Dr. Handrup was lying when the witness testified that defendant had said "Hello, Doctor." Defendant responded that Dr. Handrup was lying. Thereafter, during questioning of defendant regarding his statements to Detective O'Leary, the prosecutor asked defendant, on eight different occasions, whether Detective O'Leary had been lying. In each instance, defendant answered that the officer was lying. The prosecutor then cross-examined defendant regarding the substance of the incriminating statement he

had allegedly made to Assistant State's Attorney Sherwin while in police custody. Defendant denied having made any of the incriminating statements to the assistant State's Attorney.

■ While it is improper for the State to ask a defendant if other witnesses have given false testimony, such questioning is not ground for a new trial where, as here, the questioning is not extensive and is primarily directed to the defendant's denials of statements he has made in police custody. (See *People v. Piscotti* (1985), 136 Ill. App. 3d 420, 483 N.E.2d 363; *People v. Connors* (1980), 82 Ill. App. 3d 312, 402 N.E.2d 773; *People v. Bost* (1980), 80 Ill. App. 3d 933, 400 N.E.2d 734; see also *People v. Nwadiei* (1990), 207 Ill. App. 3d 869, 876-77, 566 N.E.2d 470 (error where questioning not directed to substance of defendant's direct examination and dominated almost all of defendant's cross-examination).) Although the State should not have cross-examined defendant in this manner, we cannot say, in light of all the evidence presented against defendant, that the error was of such magnitude that defendant should be granted a new trial.

### VII. RESPONSES TO NOTES FROM JURY
### DURING DELIBERATIONS

Defendant challenges certain of the trial court's responses to notes submitted by the jury during deliberations. In its first note, the jury requested *inter alia* a transcript to determine whether it was defendant or Ross who needed funds for defense of a legal matter. Upon receiving the note, the trial court summoned the prosecution and defense, and advised counsel that it intended to inform the jury that, although the court would not provide them with a transcript, the court would, however, inform the jurors that defendant had made a statement regarding his need for funds. Neither the State nor defendant's attorney interposed an objection to the court's remarks.

Upon so informing counsel, the court called the jurors into the courtroom and noted that "the jury asked for a transcript to determine which of the alleged criminals that it was who was facing other charges Heath Ross or Russell Morris who needed money for a defense." The trial court judge stated to the jurors, "I'm not going to provide you with a transcript. I'm going to tell you what the evidence was though and the evidence was that the defendant Russell Morris needed money for the defense of a criminal charge." The court then directed that the jury be returned to the jury room for further deliberations.

Defendant argues that the trial court should not have advised the jury that the "evidence was that the defendant *** needed money for

the defense of a criminal charge." Defendant contends that the trial court's answer to the jury was reversible error, because a trial court should not state the judge's view of disputed factual evidence. See, e.g., *People v. Pryor* (1989), 181 Ill. App. 3d 865, 537 N.E.2d 1141.

We are not persuaded by defendant's contention on this issue. Initially we note that the trial judge informed the jury that the "evidence was" that the defendant required funds for defense of a criminal matter. The trial court did not represent to the jury that the defendant had, in fact, needed money for defense of a criminal charge. In addition, we observe that the court's response was a restatement of the court's instructions to the jurors prior to deliberations. The record reflects that the court instructed the jury that references during trial to evidence of defendant's other criminal proceeding "has been received solely on the issue of defendant's motive" and that this "evidence may be considered by you only for the limited purpose for which it was received." There is nothing in this record to indicate that the jury was unable to follow or appreciate this instruction. On this record, the trial court's disposition of the juror's inquiry was not reversible error.

Defendant also challenges the court's response to a second note later sent by the jury during its deliberations. The record shows that the court summoned the State and defense and informed counsel that the note asked the question "is this accurate statement made by the Officer O'Leary that and there is no comma it is a separate thought it said he was with Reyes when Russell drove up in one of the cars of the doctor." The court advised the attorneys that it intended to tell the jury that "they had heard the evidence in this case and that's my response to that question." The court then directed the sheriff to "tell the jury exactly that they have heard the evidence in this case and that it is the judge's answer that you have heard the evidence in this case that's the judge's answer. There's nothing further." According to the record, neither the prosecution nor defense objected to or made any comment upon the court's disposition of this note from the jury.

We are unable to conclude that the court's ruling with respect to the second note submitted by the jury was inappropriate. As it is transcribed in the record before us, the jury's question to the trial court was ambiguous. When a jury poses an ambiguous question to the judge, and "any response to the question may require 'a colloquy between the court and the jury, a further explanation of the facts, and perhaps an expression of the trial court's opinion of the evidence,' the circuit court may refuse to answer the question." *People*

*v. Reid* (1990), 136 Ill. 2d 27, 39, 554 N.E.2d 174, quoting *People v. Tostado* (1981), 92 Ill. App. 3d 837, 839.

 In addition, we are unable to conclude that the acquiescence of defense counsel in the court's disposition of the jury's queries amounted to inadequate legal representation. Defendant claims on appeal that counsel should have insisted that the court provide the jury with a transcript of the testimony at issue in the jury's notes, or that counsel should have at the least requested that the court repeat its instructions to the jury to the effect that any evidence received for a limited purpose should not be considered for any other purpose. As the court had already indicated it would not provide the jury with a transcript, we can find no inadequacy in defense counsel's failure to request that the court do so.

In addition, we are not persuaded that defense counsel's failure to request reinstruction of the jury constituted incompetency. "Faith in the ability of a properly instructed jury to separate issues and reach a correct result is the cornerstone of the jury system." (*People v. Illgen* (1991), 145 Ill. 2d 353, 376, 583 N.E.2d 515.) The record does not disclose that the jury was erroneously instructed, or that the jury was confused by the instructions given by the court. Consequently, it cannot be said that defendant's trial attorney was ineffective because he did not ask the court to repeat the instructions which the jury had already received.

### VIII. CUMULATIVE ERROR

 Defendant also argues that cumulative error deprived him of a fair trial. However, we are unable to conclude that defendant's trial was fundamentally unfair. A review of the record of defendant's trial, taken as a whole, discloses no basis in this appeal to award defendant a new proceeding to submit his guilt for a jury's redetermination.

As noted more fully above, there is no ground to conclude that the trial court committed reversible error in its exclusion of court-reported transcription of jury selection. The record reveals no irregularity in opening statements of counsel. The testimony provided by the Handrups was properly admitted into evidence, and their references to their fear during the incident was not emphasized during the course of trial. The testimony of Detective O'Leary and Assistant State's Attorney Sherwin was also without substantial error, when the record is considered as a whole.

The record also establishes that defendant was not unfairly deprived of an opportunity to present his alibi defense. He gave detailed testimony at trial regarding his whereabouts at the time of the inci-

dent. The trial court properly exercised its discretion when it excluded alibi testimony from witnesses whom defendant failed to timely disclose prior to trial. The prosecution's cross-examination of defendant regarding the veracity of the State's witnesses was not prolonged and pertained primarily to the truthfulness of defendant's incriminating statements to authorities.

We note that defendant raises no error in the closing statements made to the jury, nor does defendant claim error with respect to the instructions given to the jury prior to its deliberations. With regard to the notes submitted by the jury during deliberations, we are unable to find that the court's disposition thereof amounted to reversible error.

In light of these considerations, when considering the record as a whole, we cannot say that cumulative error deprived defendant of a fair trial. An accused is not entitled to a perfect trial and cannot be heard to complain that the proceedings were unfair because he was convicted of the charges against him. (See *People v. Szabo* (1991), 144 Ill. 2d 525, 531, 582 N.E.2d 173.) The evidence against defendant in the case at bar was substantial, as noted more fully above, and we are unable to say that defendant's trial produced a result that was questionable upon review.

The record also fails to establish, in this direct appeal, that defendant's trial counsel committed error in his legal representation of defendant that would make questionable the effectiveness of the assistance he provided to defendant at trial. The record indicates that prior to trial, defense counsel filed a motion to suppress defendant's incriminating statements to authorities on the ground that the statements had been involuntary. Following a hearing, the trial court denied defendant's motion to suppress, finding that defendant's statements were not made involuntarily. As stated more fully above, we are unable to conclude that defense counsel was ineffective because he failed to file a motion to quash defendant's arrest and suppress his incriminating statements on the ground that defendant was arrested without probable cause.

The record reflects that defense counsel ably cross-examined the State's witnesses and made an unsuccessful argument to exclude references to other crimes made in defendant's incriminating statements to authorities. The record also indicates that following the State's presentation of its case in chief, defendant's attorney objected to the admission into evidence of some of the State's exhibits. After hearing argument on the matter, the trial court overruled the defendant's objections. Defense counsel then made a motion for a directed verdict with respect to the charges against the defendant. Upon considering

argument on these points, the trial court denied the motion for a directed verdict with respect to all but two charges, which the court struck for lack of evidence. The stricken charges alleged that defendant had stolen and later abandoned the Handrups' vehicles.

We decline to address defendant's claim that his defense counsel was ineffective for his failure to call additional alibi witnesses in defendant's behalf, as these arguments require consideration of matters *dehors* the record and are more properly considered in a petition for post-conviction relief.

We note that defense counsel conducted an able direct examination of the defendant and made capable closing argument to the jury. Defendant's trial counsel also successfully submitted certain jury instructions which were read to the jury, including the instruction that defendant's reference to other criminal proceedings "has been received solely on the issue of defendant's motive" and that this "evidence may be considered by you only for the limited purpose for which it was received." We cannot say that the attorney's failure to object to the court's response to notes from the jury was ineffective assistance that deprived defendant of a fair trial.

Bearing in mind these observations, we find defendant's cumulative error argument inadequate ground to grant him a new trial in this appeal.

### IX. ARMED ROBBERY SENTENCE

Defendant contends that the 25-year sentence he received for armed robbery was excessive. Defendant claims that this sentence was disparate to that received by Ross, who was only sentenced to 15 years' imprisonment.

Generally, a trial court's decision to sentence defendant to a particular term of imprisonment is entitled to deference from the reviewing court, and will not be disturbed unless manifestly erroneous. (*People v. La Pointe* (1981), 88 Ill. 2d 482, 431 N.E.2d 344; *People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.) In imposing a sentence, the trial court should impose a term within the range set out by statute. (See Ill. Rev. Stat. 1987, ch. 38, par. 1005—8—1(3) (armed robbery punishable by term of 6 to 30 years' imprisonment).) Disparate sentences for codefendants have been held proper where, for example, the defendant who receives the greater term of imprisonment was more culpable in the commission of the offense or was of a more mature age than his codefendant. See *People v. Coleman* (1990), 201 Ill. App. 3d 803, 809, 559 N.E.2d 243; *People v. McClendon* (1986),

146 Ill. App. 3d 1004, 1013, 497 N.E.2d 849; *People v. Jackson* (1986), 145 Ill. App. 3d 626, 646, 495 N.E.2d 1207.

We cannot say that the trial court's imposition of a 25-year sentence for defendant's commission of the Handrup armed robbery amounted to an abuse of discretion. The record reflects that defendant was age 19 at the time of the incident, while Ross was still a juvenile. In addition, the crime was committed to benefit defendant, who believed that he needed money from the Handrup robbery to defray legal expenses for a criminal charge that had been filed against the defendant. The trial court considered evidence in aggravation and mitigation with respect to defendant's punishment, and the 25-year sentence here fell within the statutory range for the offense of armed robbery. We find no abuse of discretion in the trial court's imposition of a greater sentence for defendant's commission of the Handrup robbery.

For the reasons stated, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

JIGANTI, P.J., and JOHNSON, J., concur.