THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. JACQUELINE WHEELER, Defendant-Appellee.

Second District    No. 2—95—0810

Opinion filed June 24, 1996.

Anthony M. Peccarelli, State's Attorney, of Wheaton (Margaret M. Healy, Assistant State's Attorney, and William L. Browers, of State's Attorneys Appellate Prosecutor's Office, of counsel), and H. Hollister Bundy, of Northfield, for the People.

Jeffrey Urdangen and Lawrence C. Marshall, both of Chicago, for appellee.

JUSTICE BOWMAN delivered the opinion of the court:

Defendant, Jacqueline Wheeler, was charged by indictment with the offense of second degree murder (720 ILCS 5/9—2(a)(1) (West 1994)). The trial court entered an order granting defendant's motion to suppress statements she made to law enforcement officials. The State appeals that order pursuant to Supreme Court Rule 604(a)(1) (145 Ill. 2d R. 604(a)(1)). We affirm.

The following summary of the facts is taken from the record. In the early morning hours of July 10, 1994, Gale White died from a gunshot wound. Later that day, defendant made statements to law enforcement officials of Du Page County which apparently incriminated her in White's death. On August 31, 1994, defendant was charged with the offense of second degree murder (720 ILCS 5/9— 2(a)(1) (West 1994)). On December 5, 1994, defendant filed a motion to suppress her July 10, 1994, statements on the grounds that (1) they were involuntarily given; (2) they were made while she was unlawfully detained by police officials; (3) they were the result of a custodial interrogation in which she was never apprised of her rights under *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966); and (4) they were elicited from her after her requests for counsel were disregarded.

On February 10, February 24, and March 6, 1995, the trial court conducted a hearing on defendant's motion. At the hearing, defendant testified that in February 1994 she moved from Portland, Oregon, to Winfield, Illinois, to live with Gale White, her fiancé. She lived with White from February 1994 to July 10, 1994, the day of White's death. In the early morning hours of July 10, 1994, she placed

a 911 telephone call from White's house. At the time she placed this call, White had been mortally wounded by a bullet. Police officers arrived, and after about one hour she was taken by ambulance to Central Du Page Hospital. Because she was "hysterical" when she arrived at the hospital, she was administered Xanax, a sedative, which made her "very drowsy." By her own account, she had not slept since 7 or 8 a.m. on July 9, 1994.

Defendant testified that after being attended to by medical personnel she was taken to a "quiet room," a small room with chairs, a table, a telephone, and windows. Once in the room, at least three or four police officers questioned her about how White had died. In response to their questions, defendant repeated her version of White's death at least three or four times. Defendant apparently told the police that White had shot himself. Defendant estimated that she stayed in the quiet room "the better part of the morning" and was able to sleep in a chair for a short period of time.

According to defendant, she used the telephone in the quiet room several times to place and receive calls from her parents in Oregon. In one of these conversations her mother told her that Nancy Huntowski, defendant's aunt, was coming to see her. When defendant asked Officer Gretchen Fehling of the Winfield police department if someone had come to see her, Officer Fehling said someone had, although she did not know if defendant would be allowed to see this person. Officer Fehling accompanied her whenever she left the quiet room, such as when she went to smoke a cigarette or to go to the rest room.

At approximately noon on July 10, 1994, defendant was taken to the Du Page County sheriff's office (police station) by Detective Greg Figiel, one of the detectives who had questioned her in the quiet room. She sat in the front seat of the car and was not handcuffed. Although she was not given the option to go home or to contact Nancy Huntowski, she went to the police station because she wanted to be "cooperative." She went to the police station with Detective Figiel because her car was at the White household.

Upon arriving at the police station, defendant was taken to an area accessible only by key or code and was initially left alone in a lobby area for approximately 10 minutes. She was then given access to a telephone, which she used to call her mother. After speaking with her mother, defendant was taken to a small windowless room with a table and hard chairs. On at least one wall was a sign which, according to the record, contained over 100 lines of small print which described the various rights an individual has in relation to the police and the court system. The door to this room was closed

throughout the questioning. Once inside the interrogation room, the officers continued to question her, and defendant continued to tell them her version of what had happened.

At about 4 p.m. on July 10, defendant met Richard O'Brien, a polygrapher who administered a polygraph examination to her. He was not introduced to her as a police officer. Before taking the examination, defendant signed a document entitled "Polygraph Subject's Statement." This document states that Richard O'Brien, polygraph examiner, has informed defendant that he wishes to question her about White's shooting. The document further states:

> "He [O'Brien] has told me [defendant] that I have the right to remain silent and that I do not have to agree to be questioned at this time unless I wish to do so. He has also told me that even though I agree to be questioned I have the right to change my mind at any time during the questioning and can refuse to answer. I may also request that the questioning be stopped and he will abide by any such decision. He has further advised me that anything I say may be used against me in court at some future time.
>
> He has further advised me that I have a right to consult with an attorney or in the event I cannot afford to retain an attorney one will be appointed to represent me. I have a right to have said attorney present if I wish during the time I am being questioned."

Defendant admitted that she read those parts of the document which provided that she had the right to remain silent, that she had the right to change her mind at any time about being questioned, that she could refuse to answer any questions, and that anything she said could be used against her in court. She did not recall heeding the parts which provided that she had the right to counsel and that if she could not afford counsel one would be appointed for her. Defendant understood the document to be "a release of an agreement in regards to the polygraph test." After taking the test, defendant was informed of the results of the examination. Those results are not part of the record on appeal.

Defendant testified that once she had taken the polygraph examination the police officers returned to the room at approximately 5:30 p.m. and began to question her again. According to defendant, the questioning became "more adamant." They told her that they did not believe she was telling the "whole truth." They suggested that she shot White in self-defense and that they would understand if that were the case because they knew White was a "bad guy" with a "previous history." Defendant initially responded to these questions and suggestions by repeating her earlier version of the day's events.

Defendant stated that she soon changed her version because the police officers made it clear to her that if she kept telling the earlier version they would have no choice but to take her into custody. The substance of this new version is not part of the record on appeal. She told this new version twice, once at approximately 5:30 p.m. and once at 6 p.m. The 6 p.m. statement was recorded on a tape cassette. Before giving the recorded statement, she was told that the rights listed on the sign hanging on the wall were her rights. However, she was not allowed to leave her chair and study them.

Anita Beal, a registered nurse at Central Du Page Hospital, testified that defendant was brought into the emergency room of the hospital at 5:05 a.m. on July 10, 1994. Defendant was "quite upset" and had an abnormally high blood pressure and pulse. At one point she found defendant in a kneeling position on the bed with a pillow over her head screaming, "I can't believe he did this." Beal administered Xanax to defendant to relieve her anxiety. The police then asked Beal if they could speak to defendant; when defendant agreed, Beal escorted defendant and the police to the quiet room. Defendant was discharged from the hospital at 11 a.m. on July 10.

Nancy Huntowski and her common-law husband, Louis Aviles, testified that defendant's mother (Huntowski's sister) called them at 5:30 a.m. on July 10, 1994, and asked them to go to Central Du Page Hospital to meet defendant. They arrived at the hospital at around 6 a.m. but the security guard would not allow them to see defendant. At about 9 a.m. they again asked to see defendant; the police informed them they could not see defendant since they were still questioning her. A few hours later they again asked to see defendant; the police told them she was going to take a polygraph test, which would take some time, and that they could go home and call or come back later. They then left the hospital and went home. At 6 or 6:30 p.m., defendant called and asked them to pick her up, which they did.

John Kinsella, deputy chief of the criminal division of the Du Page County State's Attorney, testified that on July 10, 1994, he went to the White residence and then to Central Du Page Hospital and learned that defendant had been in the White residence when White died. At approximately 10 a.m. he met defendant in the quiet room. Kinsella admitted that before he met defendant he had "serious questions" as to whether White's wound was self-inflicted. When he did meet her, he told her she was not under arrest and did not have to speak to him. He then asked her if she would answer some questions, which she agreed to do. He questioned her until 11 a.m. Throughout this questioning she maintained that she was not in the room when the gun discharged.

Kinsella further testified that at about 5:30 p.m. he questioned defendant again at the police station. During this questioning he never threatened defendant with jail, and he never told her that, if she gave a statement acknowledging that she shot White in self-defense, she would not be charged with a crime. However, he probably told her he did not believe she was being truthful. He admitted that he failed to tell her that she was not in custody and that she was free to leave. He further admitted that he confronted her with the results of the polygraph examination and certain pieces of evidence from the scene of White's death. For instance, he told her that the gun was found at the bottom of the stairs, which he explained to her was inconsistent with her explanation that White shot himself. He also told her that it was the preliminary opinion of the pathologist that White's wounds were not self-inflicted. After Kinsella confronted defendant with this "evidence," she continued to deny adamantly that she had shot White.

Detective Gregory Litzo of the Du Page County sheriff's office testified that he first met defendant in the quiet room at the hospital at 7 a.m. on July 10, 1994. With Detective Jeffrey Hunger of the Winfield police department, he questioned her until 8 a.m. When Kinsella finished questioning her at 11 a.m., he resumed questioning defendant until approximately 12 p.m. He denied ever telling her that she would go to jail if she did not change her version of the day's events.

Detective Hunger testified that he met defendant in the quiet room between 6 and 7 a.m. on July 10, 1994. He told her she was not under arrest and that he needed some information. He left the room when defendant's mother made a telephone call to her. At 7 a.m. he reentered the room with Detective Litzo and resumed questioning defendant until 8 a.m. At 11 a.m., defendant's hands were tested for gun powder residue.

Detective Hunger also testified that he again questioned defendant at the police station at 5:30 p.m. on July 10. Kinsella was also in the room. After this questioning was done and defendant had given a statement which apparently incriminated her in White's death, Kinsella left and Detective Greg Figiel of the Du Page County sheriff's office entered. At approximately 6 p.m., defendant gave a recorded statement which apparently mirrored the statement she gave at 5:30 p.m. At the beginning of this statement, Detective Hunger stated that O'Brien had advised her about her rights and that "there were rights on both sides of the wall in this interview room." He denied telling defendant she could leave if she changed her version of the day's events.

Detective Figiel testified that after defendant agreed to take a polygraph examination he offered to drive her from the hospital to the police station. She accepted his offer and sat in the front seat and smoked. She was not handcuffed.

Officer Gretchen Fehling of the Winfield police department testified that defendant left the quiet room on several occasions to smoke a cigarette and that she would sometimes accompany her when she left. When she did not accompany defendant, she kept her in her line of sight. She also accompanied defendant to the rest room to make sure that she did not wash her hands because they had not yet conducted the gun powder residue test.

Richard O'Brien testified that he is the polygraph examiner who administered a polygraph test to defendant on July 10, 1994, from 3 to 4 p.m. He admitted that the document labelled "Polygraph Subject's Statement" was designed for a subject about to take a polygraph examination. He is not a police officer and was not introduced to defendant as a police officer.

On June 9, 1995, after hearing oral arguments on the matter, the trial court found that defendant's statements were voluntarily given; that the questioning of defendant became "much more confrontational" and accusatorial after 5:30 p.m.; and that defendant was in custody at the time of her statement at 5:30 p.m. and subsequent to that. The trial court also found that defendant was not given adequate *Miranda* warnings. The trial court therefore ordered that defendant's oral and tape-recorded statements be suppressed. On June 28, 1995, the State filed its timely notice of appeal.

The State has one principal contention on appeal: the trial court erred in suppressing defendant's statements. The State offers two arguments in support of this contention: (1) defendant was not in custody when she made the 5:30 and 6 p.m. statements; and (2) alternatively, even if she was in custody, she was nevertheless given adequate *Miranda* warnings. We will address each argument separately.

The State initially argues that defendant was not in custody when she made the 5:30 and 6 p.m. statements. The State argues that an examination of the relevant factors reveals that the trial court's finding that defendant was in custody is manifestly erroneous.

We note preliminarily that we will not disturb a trial court's determination on a motion to suppress unless it is manifestly erroneous. *People v. Melock*, 149 Ill. 2d 423, 432 (1992). We further note that it is the function of the trial court to determine the credibility of the witnesses and to resolve any conflict in their testimony. *Melock*, 149

Ill. 2d at 432. We must presume that the trial court credited only the testimony which supports its ruling. *People v. Winters*, 97 Ill. 2d 151, 158 (1983); *People v. Bosnak*, 262 Ill. App. 3d 122, 126-27 (1994).

The fifth amendment to the United States Constitution guarantees that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const., amend. V. In order to safeguard this right against self-incrimination, the United States Supreme Court held, in *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966), that any person subject to custodial interrogation must be warned prior to questioning that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to counsel, either retained or appointed. Incriminating statements obtained before these warnings are administered are inadmissible at trial. *Miranda*, 384 U.S. at 444, 16 L. Ed. 2d at 706, 86 S. Ct. at 1612; *Melock*, 149 Ill. 2d at 439.

■ Custodial interrogation means questioning initiated by law enforcement officials after a person has been taken into custody or otherwise deprived of his freedom in any significant way. *Miranda*, 384 U.S. at 444, 16 L. Ed. 2d at 706, 86 S. Ct. at 1612; *People v. Brown*, 136 Ill. 2d 116, 124 (1990). The ultimate inquiry is whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest. *California v. Beheler*, 463 U.S. 1121, 1125, 77 L. Ed. 2d 1275, 1279, 103 S. Ct. 3517, 3520 (1983). Although what constitutes police custody is not always self-evident, the *Miranda* Court was concerned with interrogations that take place in a police-dominated environment containing "inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." *Miranda*, 384 U.S. at 467, 16 L. Ed. 2d at 719, 86 S. Ct. at 1624.

■ In determining whether an interrogation is custodial, courts consider several factors, including: the location, length, mood, and mode of the interrogation; the number of police officers present; the presence or absence of family members; any indicia of formal arrest procedure; the manner by which the defendant arrived at the place of interrogation; the age, intelligence, and mental makeup of the defendant; the intentions of the officers; and the extent of knowledge of the officers and the focus of their investigation. *Melock*, 149 Ill. 2d at 440; *Brown*, 136 Ill. 2d at 124-25; *People v. Watson*, 223 Ill. App. 3d 143, 145 (1991). After weighing these factors, the trial court must make an objective determination as to what a reasonable person, innocent of any crime, would perceive if he were in the defendant's position. *Melock*, 149 Ill. 2d at 440; *Brown*, 136 Ill. 2d at 125.

■ The trial court's (implicit) finding that a reasonable person in

defendant's position would perceive that the questioning at 5:30 p.m. was custodial is not manifestly erroneous. The location of the questioning supports this finding. Defendant was questioned at the police station in a small windowless room located in a secured section of the building. The door remained closed throughout the questioning. We recognize that merely because a suspect is questioned at a police station does not mean that he is in custody for purposes of *Miranda*. See *Oregon v. Mathiason*, 429 U.S. 492, 495, 50 L. Ed. 2d 714, 719, 97 S. Ct. 711, 714 (1977). However, we also recognize that where, as here, the police select a police station as the location for questioning a suspect, this setting naturally supports the argument that the suspect was subject to a custodial interrogation. See *People v. Gorman*, 207 Ill. App. 3d 461, 470-71 (1991). Consequently, we are satisfied that the location of the questioning supports the finding that defendant was in custody at 5:30 p.m.

The length of the questioning further buttresses this finding. Defendant was questioned intermittently from approximately 6 a.m. to 12 p.m. at the hospital and from approximately 1 p.m. to 6:15 p.m. at the police station. Although defendant was not in custody until 5:30 p.m., it is proper for us to consider the events prior to that time because they would have influenced a reasonable person's understanding as to whether he was free to leave. See *Brown*, 136 Ill. 2d at 126. Thus, the length of the questioning supports the trial court's finding that defendant was in custody.

The mood and mode of the questioning also support the finding that defendant was in custody at 5:30 p.m. According to the trial court, the mood of the questioning became more adversarial and confrontational at 5:30 p.m. At this time, Kinsella and Detective Hunger employed a classic interrogation technique: they confronted defendant with "evidence" (*i.e.*, the results of her polygraph test, the pathologist's opinion that White's wounds were not self-inflicted) contradicting her version of White's death; they told her they did not believe she was telling the truth; they told her they knew White was a "bad guy" with a "previous history"; and they suggested that she shot White in self-defense. See *Miranda*, 384 U.S. at 448-55, 16 L. Ed. 2d at 708-12, 86 S. Ct. at 1614-17 (describing police interrogation techniques such as offering a suspect legal excuses for her actions in order to obtain an admission of guilt). While the State's witnesses denied making most of those statements, we must presume that the trial court believed defendant's testimony since it supports the trial court's ruling. See *Winters*, 97 Ill. 2d at 158; *Bosnak*, 262 Ill. App. 3d at 126. Based on this evidence, the mood and mode of the questioning support the trial court's finding that defendant was subject to a custodial interrogation at 5:30 p.m.

Other factors further support the trial court's finding that defendant was in custody at 5:30 p.m. Defendant was driven from the hospital to the police station by Detective Figiel. Once there, she was questioned by at least two law enforcement officials at 5:30 and again at 6 p.m. Moreover, defendant was not allowed to visit with her aunt and uncle at the hospital, and by 5:30 p.m. defendant had essentially not slept for approximately 34 hours.

The final factor which supports the trial court's finding that defendant was in custody is the knowledge of the law enforcement officials and the focus of their investigation. When determining what a reasonable person would think, the trial court should consider the law enforcement officials' knowledge and the focus of the investigation, although it is unlikely that this determination will control the conclusion of whether the interrogation is custodial. *Brown*, 136 Ill. 2d at 129. Of course, this factor is not relevant if the officials' knowledge, suspicion, intent, focus, subjective view, or thought of any kind is undisclosed to the defendant, since undisclosed thoughts can neither influence the defendant nor affect the coercive atmosphere of the interview in any way. See *People v. Goyer*, 265 Ill. App. 3d 160, 167 (1994).

In the present case, the law enforcement officials told defendant they did not believe she was telling the truth, and they confronted her with "evidence" they claimed contradicted her version of White's death. Thus, the officials disclosed their knowledge and suspicions to defendant by 5:30 p.m., thereby supporting the trial court's finding that the interrogation of defendant became custodial at that time.

Taken together, these above factors amply support the trial court's finding that defendant was in custody after 5:30 p.m. Defendant was questioned in a small windowless room located in a secured area of the police station; she was intermittently questioned for approximately 11 hours; she had not slept for essentially 34 hours; she was not allowed to visit with her relatives; she was driven to the police station by the police; the questioning became more adversarial and confrontational at 5:30 p.m.; and, by 5:30 p.m., the law enforcement officials had disclosed to defendant that she was the focus of their investigation. Given these factors, we are not prepared to conclude that the trial court's finding that a reasonable person in defendant's position would not feel free to leave is manifestly erroneous.

We realize that some factors militate against the trial court's finding that defendant was subject to a custodial interrogation at 5:30 p.m. Defendant was allowed to speak with her parents on the telephone at the hospital and once at the police station. There was no

evidence of any formal arrest procedures—defendant was never "booked," fingerprinted, handcuffed, or otherwise physically restrained. Moreover, defendant agreed to accompany Detective Figiel to the police station, and in the ride to the station she sat in the front seat of his car and smoked (although defendant also testified that she did not have an automobile at the hospital and thus could not have driven herself to the station).

Despite these factors, we are compelled to affirm the trial court's ruling. We emphasize that the trial court's finding on the issue of custody is a question of fact, and we will not disturb that finding unless it is manifestly erroneous. *Gorman*, 207 Ill. App. 3d at 468. In light of this narrow standard of review as well as the factors which do support the trial court's finding, we conclude that the finding that defendant was in custody at 5:30 p.m. is not manifestly erroneous.

The State next argues that, even if defendant was in custody at 5:30 p.m., she was nevertheless given adequate *Miranda* warnings. The State sets forth two bases for this argument.

■ First, the State maintains that defendant was given adequate *Miranda* warnings because she read and signed the document entitled "Polygraph Subject's Statement." According to the State, this document specifically included the *Miranda* warnings; as such, the trial court's finding is manifestly erroneous.

We disagree. The "Polygraph Subject's Statement" states that O'Brien, a man who was not introduced to defendant as a police officer, wanted to question her about White's shooting. The document further states that defendant understood that she did not have "to agree to be questioned at *this time*," that "at any time *during the questioning*" she could change her mind and refuse to answer the questions and that she had a right to have an attorney present "*during the time [she was] questioned*." (Emphasis added.) Thus, in at least three passages, the document specifically links defendant's rights to the polygraph examination conducted by O'Brien, a nonpolice officer. Moreover, defendant testified that she thought the "Polygraph Subject's Statement" applied only to the polygraph examination, and we must presume that the trial court believed this testimony since it accords with its ruling. See *Winters*, 97 Ill. 2d at 158; *Bosnak*, 262 Ill. App. 3d at 126-27. Based on the record before us, the trial court's finding that the *Miranda* warnings listed in the "Polygraph Subject's Statement" pertained only to the questioning conducted during the polygraph examination is not manifestly erroneous.

Further, we disagree with the State's position that *People v. Hobley*, 159 Ill. 2d 272 (1994) should control our resolution of this issue.

In *Hobley*, the defendant signed a written waiver of his *Miranda* rights and was administered a polygraph examination. 159 Ill. 2d at 291. On appeal, the defendant claimed that he misunderstood the effect of signing the written waiver form. The defendant claimed he thought the form only pertained to the polygraph examination. The supreme court rejected this argument and held that "any 'misunderstanding' involved with signing the written form [did not] limit[ ] the effectiveness of the *Miranda* warnings given to defendant prior to his polygraph examination." *Hobley*, 159 Ill. 2d at 293.

In our view, *Hobley* is inapposite to the decision we reach today. In *Hobley*, there is no indication that the written waiver form actually pertained only to the polygraph examination. Rather, the defendant's claim was apparently based solely on his subjective belief that the written waiver form only pertained to the polygraph examination. Here, by contrast, the trial court found, after reviewing the "Polygraph Subject's Statement" and the circumstances under which it was signed, that it pertained only to the questioning conducted during the polygraph examination. Thus, we will not disturb the trial court's finding because there is no indication that the written waiver form in *Hobley* stated that it pertained only to the polygraph examination.

Second, the State maintains that defendant was given adequate *Miranda* warnings because Detective Hunger stated on the 6 p.m. recorded statement that defendant had been apprised of her rights. Although a transcript of the 6 p.m. recorded statement is not included in the record on appeal, Detective Hunger's introduction of this statement is included. In this introduction, Detective Hunger stated:

"Jacqueline, we started explaining for the record that when we interviewed we made no promises or threats to you. And you have been advised about your rights.

Polygraph examiner advised you about your rights. The rights are here on the wall, on both walls. What we want to do is, John Kinsella, the gentleman that was speaking to you earlier, that was right here.

What we want you to do is tell us everything that you know that you mentioned in your interview with him, you can start with a, a, the events of yesterday, starting with immediately after the phone call, after you spoke with Chad, after you got off the phone with Chad, and then after what you explained to us about Gale [White], you know, or saying that he heard what you were talking about. Okay? Is that all right?"

Defendant responded, "Uh-huh," and proceeded to give the second statement. The State reasons that Detective Hunger's statement,

when viewed in context, as well as defendant's response, indicate that defendant was given adequate *Miranda* warnings.

The Supreme Court has never insisted that *Miranda* warnings be given in the exact form described in that opinion. *Duckworth v. Eagan*, 492 U.S. 195, 202, 106 L. Ed. 2d 166, 176-77, 109 S. Ct. 2875, 2880 (1989). The *Miranda* Court merely stated that "[t]he warnings required and the waiver necessary in accordance with our opinion today are, *in the absence of a fully effective equivalent*, prerequisites to the admissibility of any statement made by a defendant." (Emphasis added.) *Miranda*, 384 U.S. at 476, 16 L. Ed. 2d at 725, 86 S. Ct. at 1629; see also *California v. Prysock*, 453 U.S. 355, 359, 69 L. Ed. 2d 696, 701, 101 S. Ct. 2806, 2809 (1981) (*per curiam*) ("no talismanic incantation [is] required to satisfy [*Miranda*'s] strictures"). Nevertheless, *Miranda* warnings must reasonably convey to a suspect his rights. *Duckworth*, 492 U.S. at 203, 106 L. Ed. 2d at 177, 109 S. Ct. at 2880.

In the present case, Detective Hunger's statements did not reasonably convey to defendant her rights. We do not believe that Detective Hunger's reference to the sign on the wall constitutes adequate *Miranda* warnings, especially since there is no evidence that defendant was allowed to read the sign.

Detective Hunger's statements also do not establish that defendant was apprised of her rights before she gave any of her statements. Detective Hunger's statement that the "[p]olygraph examiner advised you about your rights" does not transform the "Polygraph Subject's Statement" into an all-encompassing apprisal of defendant's rights. As noted, that document related only to the polygraph examination, and Detective Hunger's references to it do not alter that fact. Nor did Detective Hunger's statements "[a]nd you have been advised about your rights" and "[the] [p]olygraph examiner advised you about your rights," even when read together, reasonably apprise defendant that the rights listed in the "Polygraph Subject's Statement" also applied to the ensuing 6 p.m. interrogation. Finally, defendant's response could be legitimately viewed as a response to Detective Hunger's suggestion that she begin her statement by explaining the events leading up to White's death, rather than as an acknowledgment that she had been given the *Miranda* warnings. Given these ambiguous and vague statements, we are not prepared to conclude that the trial court's finding is manifestly erroneous.

For the foregoing reasons, the judgment of the circuit court of

Du Page County is affirmed, and the cause is remanded for further proceedings.

Affirmed and remanded.

DOYLE and RATHJE, JJ., concur.