THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. GERMAINE JONES, Defendant-Appellant.

First District (6th Division)   No. 1—92—1039

Opinion filed June 24, 1994.

Michael J. Pelletier and Kenneth L. Jones, both of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and Veronica Calderon, Assistant State's Attorneys, of counsel), for the People.

JUSTICE GIANNIS delivered the opinion of the court:

Following a jury trial, defendant was convicted of attempted first degree murder and of armed robbery. After a hearing in aggravation and in mitigation, defendant was sentenced to consecutive terms of 28 years for the armed robbery conviction and 20 years for the attempted murder conviction. Defendant challenges his convictions and sentences, claiming (1) he was deprived of the right to a fair trial by improper closing argument by the prosecutor, (2) the trial court abused its discretion in imposing consecutive sentences for the attempted murder and armed robbery convictions, and (3) he was deprived of his right to a public trial by the trial court's order that a deputy sheriff seize a spectator's notes during the hearing on defendant's motion to quash his arrest.

The record reflects that defendant, Germaine Jones, was indicted along with codefendant, Karl E. Simmons, for attempted first degree murder, armed robbery, armed violence, and aggravated battery. Codefendant Simmons filed a motion for severance which was granted by the trial court. Thereafter, Simmons pled guilty to the charges against him and received concurrent sentences of 22 years.

Prior to defendant's trial, the court conducted a conference pursuant to Supreme Court Rule 402 (134 Ill. 2d R. 402), and the court and counsel agreed that if defendant were to plead guilty to armed robbery and attempted murder, he would be sentenced to a term of 22 years and would receive a consecutive term of three years for an unrelated "escape" charge. Defendant declined to accept the offer which resulted from this Rule 402 conference and elected to be tried by a jury.

Before the jury trial commenced, defendant brought a motion to quash arrest and to suppress evidence. At the hearing on this motion, the judge confiscated the notepad and pen of an individual who had been taking notes during the proceedings. The record reflects the following exchange:

"[THE COURT]: Yes. Just a minute. I have the impression that somebody is sitting out there, taking notes.

[UNIDENTIFIED VOICE]: I am, for myself.

[THE COURT]: That is not apropos. Deputy, please pick up the notepad.

[PROSECUTOR]: When you say the police went to Apartment 20, while you were sitting in the car, did you know—

[THE COURT]: And the pen. Thank you."

No objection was raised by defense counsel. The court subsequently denied defendant's pretrial motions.

At trial, Joseph Kennedy testified that he lived in a condominium in Calumet City with his wife and two children. Kennedy

described the security system installed in the condominium complex which allowed residents with a key card access through a gate. Nonresidents had to be admitted by a guard after a resident indicated that the visitor should be admitted. In January 1989, Kennedy owned a 1986 Mercedes Benz.

On January 26, 1989, Kennedy pulled into the underground parking garage of his condominium building when he came home from work at approximately 4:30 p.m. Kennedy stated that he went to a church meeting at 6 p.m. and returned home at approximately 8:20 p.m. Kennedy then went down to the parking garage to check the oil and clean the car because his wife was going to drive to Rockford the following day. Kennedy testified that he was in the garage for about 45 minutes when the door connecting his building to the building next door opened and two black males walked into the parking garage. These two young men were approximately 50 feet away from Kennedy, and he observed them for about 15 to 20 seconds. Kennedy stated that he had a clear view of these two individuals because the garage was illuminated by fluorescent lights and because nothing obstructed his line of vision. According to Kennedy, these two young men were unkempt and did not appear to be residents of the building. Kennedy stated further that he had never seen these individuals before that night.

Kennedy testified that he continued to observe the two individuals as they walked toward him and got within a distance of 15 to 20 feet. As the two individuals passed by him, Kennedy was able to get a good look at them and noticed that one of the individuals was noticeably taller than the other one. Kennedy then went up to his apartment, which was on the fifth floor, got his wallet, and then returned to the parking garage. Kennedy stated that he had gone to get his wallet because he was going to fill the car up with gas. As Kennedy came back downstairs, he started walking through the lobby until he reached the door which led to the garage. Kennedy testified that when he looked through the glass pane in this door, he saw one of the two young men that he had seen earlier in the garage. As Kennedy proceeded to walk through the door, he acknowledged the shorter individual who was standing next to the door. The young man did not say anything, but grabbed the door and closed it behind Kennedy. Kennedy testified that as he approached his car, he was then confronted by the taller individual, who had put a mask on his face and was carrying a gun.

Kennedy testified that the taller individual pointed the gun at him, told him to raise his hands, and demanded all of Kennedy's money, his wallet, and his jewelry. When Kennedy said that his

wallet was inside his coat pocket, the man with the gun told him to take it out, but to "be careful." Kennedy stated that after he took his wallet from his pocket and threw it on the floor, the young man picked it up. After he looked inside, the young man said, "[t]here is no money in here. Give me all your money, man, or *** I'm going to shoot you." Kennedy testified that, although he said that he did not have any money and turned his pants pockets inside-out to illustrate, the taller individual cocked the gun back and told Kennedy, "I'm going to kill you, man, shoot you, if you don't give me all your money." Kennedy stated that he then told the young man with the gun that he could take Kennedy's car, and he tossed the keys to the floor. According to Kennedy, the shorter individual picked up the car keys, walked over to Kennedy's car, asked Kennedy if he had an alarm system, and then entered the car.

While the taller young man held the gun pointed at Kennedy, the shorter individual went through Kennedy's car and opened the trunk. The shorter of the two young men then told Kennedy to strip his clothes off and get into the trunk of the car. Kennedy testified that when he refused, the shorter young man said, "[w]ell, we're going to have to kill you, man, ... because you saw our face[s]." Kennedy responded by saying, "[n]o reason for you guys to do this, *** I haven't done nothing to you, I don't even know you, *** I don't even know you. *** Why are you going to shoot me? I have a wife and kids." The shorter of the two young men again told Kennedy that they were going to kill him because he had seen their faces. The shorter individual then told his companion to "[s]hoot him ... Shoot [him], man." Kennedy testified that he again asked the young men why they wanted to shoot him. Kennedy said, "[m]an, wait a minute, I haven't done anything. Why do you want to shoot me for[?]" Nevertheless, the shorter young man again told his companion to shoot Kennedy. The taller individual then fired approximately three shots at Kennedy.

Kennedy testified that after the taller young man shot him, he turned and ran toward the door which led back to the building from the parking garage. Kennedy opened the door with his key and proceeded into the hallway of the building. He then lost consciousness for a time, but was lying on the hallway floor when he regained consciousness. Kennedy testified that he then managed to get up and struggle over to the elevator, get inside, and push the button for the fifth floor. Kennedy stated that when he reached the fifth floor, he collapsed on the hallway floor and began calling for his wife, but no one responded. Kennedy then saw his keys on the floor, so he grabbed them, crawled over to his unit, opened the door, and dragged himself

inside, closing the door behind him. According to Kennedy, he next crawled into the bedroom and laid across his bed because he was in such pain. Kennedy then picked up the telephone, dialed 911, and told the operator he had been shot. He also gave the operator his address and condominium number. Shortly thereafter, the paramedics arrived and took him to St. Margaret's Hospital, where Kennedy remained for approximately two weeks. Kennedy testified that he was shot once in the right leg, once in the back of his left thigh, and once in the abdomen.

Kennedy stated that on January 30, 1989, he was visited at the hospital by two Calumet City policemen who showed him six photographs of different individuals. From these photographs, Kennedy identified defendant Jones and codefendant Simmons as the two individuals who robbed and shot him four days earlier. Kennedy identified defendant Jones as the young man who shot him in the parking garage.

The prosecution called Brittie Anderson, who testified that he was at home on January 26, 1989, and that defendant Jones and codefendant Simmons came to his house. Defendant Jones asked Anderson whether he knew how to use credit cards and a cash station card. As he was asking these questions, Jones was looking through a wallet which had some credit cards in it. Anderson stated that he saw the credit cards which Jones was holding and that he was able to read the name "Joe Kennedy" on one of the cards. According to Anderson, Jones stated that he had just gotten the wallet by holding someone up at River Oaks. Jones said that he and Simmons had walked up on a man while he was washing a Mercedes Benz and demanded the man's wallet. Jones told Anderson that he was carrying the gun at the time they robbed Kennedy, and Jones admitted shooting Kennedy after Simmons told him to shoot. Jones said that he had asked Kennedy if he had any money, but when Kennedy replied that he only had credit cards with him, Jones shot him in the leg and then shot him again as Simmons told him to do.

Anderson testified that when Jones and Simmons arrived at his house on January 26, 1989, Jones was carrying a .38-caliber revolver and two empty shells on his person. Anderson stated that Jones took the shells out of the gun and put them in a plastic grocery bag along with Kennedy's wallet and the credit cards. Anderson testified that Jones and Simmons then began to act out the shooting. Jones pretended to shoot Simmons in the leg and in the stomach, and Simmons limped and acted as if he had just been shot. After this, Jones and Simmons started laughing. Anderson stated that the three then

talked about going to Milwaukee the following day, but Anderson decided not to go. The next day Anderson was arrested for the theft of an automobile.

Anderson acknowledged that he had a robbery charge pending against him before another judge. Anderson stated that the prosecutor in that case told him he would recommend probation if Anderson testified in the prosecution of Jones and Simmons for the robbery and shooting of Kennedy.

Sergeant Zorzi testified that he investigated the robbery and shooting of Joseph Kennedy on January 26, 1989. Zorzi described his actions during the course of the investigation, including the apprehension of defendant Jones. Many of the details of Zorzi's investigation, including his description of Kennedy's condition, the crime scene, and Kennedy's condominium unit corroborated the testimony given by Kennedy. Zorzi testified that Jones ultimately gave two statements in which he admitted his involvement in the robbery and shooting of Joseph Kennedy. In his first statement, Jones claimed that Simmons had carried the gun and shot Kennedy. In his second statement, however, Jones admitted that he had held the gun and had shot Kennedy in the leg at the urging of Simmons. In this second statement, Jones indicated that the gun accidentally discharged a second time as Kennedy was running away.

Zorzi also testified that although he searched a dumpster behind Anderson's house and the landfill where the garbage had been dumped, he was unable to locate Kennedy's wallet or the two empty shell casings from the gun used in the shooting.

Colleen McSweeny-Moore testified that she was an assistant State's Attorney. On February 1, 1991, she was one of the assistants assigned to the courtroom of Judge Gierach and was present when the clerk called the case against Jones and Simmons. After being brought into the courtroom from the lock-up, defendant ran across the courtroom, jumped over the gate, and fled through the door. Defendant was subsequently apprehended by a deputy sheriff. Codefendant Simmons also ran, but was stopped at the courtroom door.

During closing argument, the prosecutor made the following remarks:

> "Think if any one of you had walked into that same situation, go into your car, ready to go get gas and the next thing you know this thing is coming at you.
>
> * * *
>
> Mr. Joseph Kennedy on that day did not say, 'Save my life for me.' It was not his worst nightmare. It was his second worst nightmare because Joe Kennedy—The worst nightmare would

have been if his wife and children were being shot. *** He said, 'I've got a wife and family.' He didn't say, 'Leave me alone. I don't want to die.' That's not Joe Kennedy.

\* \* \*

And then maybe Brittie Anderson wasn't laughing hard enough so [defendant] probably said, 'You know what? We stuffed him into a car. We stuffed him in the trunk. What do you think of that, Brittie? We stuffed him into a trunk.' And why he told him that is because he's evil."

Defense counsel immediately objected to the statement that defendant was evil. The trial court promptly sustained the objection and instructed the jury that closing argument was not to be considered as evidence against the defendant. The prosecutor continued with the following argument:

"I think of a man—[t]wo young men, sixteen years of age. I don't know why, at sixteen, they would have this evil inside of them as they did."

Defense counsel again objected, but the court overruled this objection.

The prosecutor also argued as follows:

"The second shot? Oh, that's when [defendant] turned and that was an accident. An accident.

Now, if any of you know that a revolver is like, pulling the trigger—."

In response to an objection by defense counsel, the trial court instructed the jury that what the lawyers said at this point was not evidence but was merely argument. The court then permitted the prosecutor to proceed with his argument. The prosecutor continued with the following argument:

"If any of you know what a revolver is like, pulling the trigger, having the chamber turn all the way to the next round and then firing it—An accident? That's what he wants you to believe.

\* \* \*

I don't know where the gun is at. I don't know where the credit cards are at. Only two people know where they're at, but the defense would have you believe we should know where they're at.

We don't know where they're at, but they would have you believe why did we not produce them. How can we produce it? They have it."

Defense counsel's objection to this comment was overruled, and the court again instructed the jury that the closing arguments were not to be considered as evidence against the defendant.

The prosecutor concluded his argument with the following remarks:

"I tell you this case, ladies and gentlemen, is an exceptionally good case. The evidence is overwhelming, and I respectfully submit that if you follow the law, if you follow the law in this case, that you will find [defendant] guilty of all four of these charges. Thank you."

Defense counsel raised no objection to these concluding comments.

Upon hearing closing argument and receiving instructions from the trial judge, the jury retired for its deliberations. At that time, defense counsel made an oral motion for a mistrial based upon the prosecutor's statement during closing argument that defendant was "evil" and based upon his reference to the defendant as a "thing." The trial court denied the motion for a mistrial, and the jury found defendant guilty of attempted murder and armed robbery.

Defendant also filed a motion for a new trial, claiming, *inter alia*, that he was deprived of the right to a fair trial based upon the prosecutor's statement that he was "evil." The trial court denied the motion for a new trial.

At the sentencing hearing, the prosecutor presented the testimony of Dorrell Long, who stated that on January 28, 1989, he was on his way to a store to buy milk and diapers for his daughter. Before going to the store, Long stopped to get some cash at a drive-up automatic teller machine. While parked at the teller machine, which was about one block from his house, Long noticed a dark Riviera on the street that bordered the parking lot, and Long was able to see the driver of that vehicle. As he put his bank card into the teller machine, Long was approached by a young man who was holding a silver revolver. The young man told Long to "just be cool." Long pulled his car away from the teller machine, and the young man fired the gun at him as he drove away. As he drove down the street that bordered the parking lot, Long noticed a dark Buick Riviera in front of his vehicle, and Long honked his horn in an attempt to get some help. Long then saw the individual who had fired the gun at him jump into the Riviera. This young man then got out of the Riviera and began shooting at Long again. Long identified defendant Jones as the driver of the Riviera.

Defendant presented no evidence in mitigation but relied upon the information contained in the presentence investigation report.

The trial court sentenced defendant to consecutive terms of 28 years for armed robbery and 20 years for attempted murder. In sentencing defendant, the trial court indicated that it had considered the evidence and arguments presented in aggravation and in mitigation, had considered the testimony of the witnesses, had considered the expression of sympathy for Kennedy by defendant, and recalled

and considered the evidence presented at trial, including the evidence regarding defendant's attempt to escape from custody. The court also found credible the testimony of Dorrell Long presented by the State in aggravation. In addition, the court noted the requirements of section 5—8—4(a) of the Unified Code of Corrections (see 730 ILCS 5/5—8—4(a) (West 1992)). The court found that the defendant inflicted extreme psychological terror on the victim during the armed robbery. The court also determined that defendant's conduct indicated that he was "at war with society."

In commenting upon the sentence imposed upon codefendant Simmons for the same offenses, the trial court stated as follows:

"I'll tell you one thing as far as [K]arl Simmons. Obviously when I go into a [Rule 402] conference, I don't have the evidence before me. I haven't listened to the testimony. I listen to maybe about three or four minutes of recitation of the facts in the case, and then I make my decision based on that, and when I start a conference, I tell the parties obviously I am listening to what the parties believe the evidence is going to show. I have no idea how the evidence will come out. It can either be better for the defendant or it can be worse for the defendant depending on the testimony received. And I will tell you this. There's no way on earth that I would have given [K]arl Simmons the sentence that I gave had I heard the testimony that I've heard in both of these cases that I've heard testimony on."

We initially consider defendant's claim that he was deprived of the right to a fair trial based upon improper closing argument by the prosecutor.

Specifically, defendant claims he was prejudiced by the prosecutor's reference to him as a "thing." We observe, however, that defendant failed to object to this comment during trial and failed to include it in his post-trial motion.

●1 Absent plain error, failure to raise an issue at trial and in a post-trial motion constitutes waiver of the issue on appeal. (*People v. Turner* (1989), 128 Ill. 2d 540, 555, 539 N.E.2d 1196; *People v. Enoch* (1988), 122 Ill. 2d 176, 186, 522 N.E.2d 1124.) The plain error exception will be applied only when the evidence is closely balanced or if the error is of such a magnitude that the accused is denied a fair and impartial trial. (*Turner*, 128 Ill. 2d at 555.) Based upon the record before us, we hold that the evidence was not so closely balanced and that the prosecutor's remark was not so improper as to deprive defendant of a fair trial. Consequently, application of the plain error doctrine is not warranted here, and defendant has waived this issue by failing to object at trial and by failing to include it in his motion for a new trial. *Turner*, 128 Ill. 2d at 555; *Enoch*, 122 Ill. 2d at 186.

●2 Similarly, defendant failed to object to the prosecutor's expression of his personal belief that the case against defendant was "an exceptionally good case" and that "the evidence was overwhelming." Defendant also failed to object to the prosecutor's reference to the victim's family. Consequently, defendant has waived these issues by failing to object at trial and by failing to include them in his motion for a new trial. *Turner*, 128 Ill. 2d at 555; *Enoch*, 122 Ill. 2d at 186.

Defendant also contends that he was deprived of a fair trial by the prosecutor's statement that defendant was "evil."

The record indicates that defense counsel immediately objected to this statement, and the trial court promptly sustained the objection and instructed the jury that closing argument was not to be considered as evidence against the defendant. Thereafter, the prosecutor stated that he did not know why defendant Jones and codefendant Simmons "would have this evil inside of them as they did." Defense counsel's objection to this remark was overruled. The trial court reviewed this decision when defendant raised the issue in his motion for a mistrial and again when defendant raised it in his motion for a new trial. In denying the motion for a mistrial, the trial court specifically found that this comment was permissible based upon the evidence in the case.

●3 In light of the nature of defendant's actions, including his repeated threats to kill Kennedy and his order that Kennedy remove his clothes and get into the trunk of his own car, we believe the trial court correctly determined that the prosecutor's statement constituted a permissible comment upon the evidence presented at trial.

●4 Defendant also claims that the trial court erred in overruling his objection to the prosecutor's statements as to the workings of a revolver. The record indicates that the trial judge immediately admonished the jury that the arguments of counsel were not to be considered as evidence. Thus, any potential error caused by this argument was cured by the court's immediate admonishment. *People v. Harris* (1989), 129 Ill. 2d 123, 160-61, 544 N.E.2d 357; *People v. Terry* (1984), 99 Ill. 2d 508, 517, 460 N.E.2d 746; *People v. Maloney* (1990), 201 Ill. App. 3d 599, 613, 558 N.E.2d 1277.

Defendant next asserts that the trial court erred in overruling his objection to the prosecutor's statement that he did not know where the gun and credit cards were because the defendants had them.

The record reveals that defense counsel made the following remarks during his closing argument:

"Where's the gun? Where's that thirty-two caliber? By these al-

leged statements, the alleged statements say it's a twenty-two. Where's the wallet? Where are the credit cards that would corroborate what Brittie Anderson says?"

●5 The prosecutor's statements that he did not know the location of the gun and credit cards were designed to answer defense counsel's argument that the State had failed to present any physical evidence to support the testimony of Anderson. These comments were proper in light of the fact that Zorzi testified that he had been unable to locate the gun, wallet and credit cards even though he had searched for these items in the dumpster behind Anderson's apartment and in the landfill to which the garbage had been taken. When considered in context, the prosecutor's comments were not improper or prejudicial. See *Turner*, 128 Ill. 2d at 561.

It is established that prosecutors have a great deal of latitude in making closing arguments, and the trial court's determination as to the propriety, and possible prejudicial effect, of the prosecutor's closing argument will be followed, absent a clear abuse of discretion. (*People v. Morgan* (1986), 112 Ill. 2d 111, 131, 492 N.E.2d 1303.) Arguments and statements based upon the facts in evidence, or upon reasonable inferences drawn therefrom, are within the scope of proper argument. (*Terry*, 99 Ill. 2d at 517.) In reviewing allegations of prosecutorial misconduct, the closing arguments of both the State and of defense counsel must be examined in their entirety, and the allegedly improper remarks must be placed in the proper context. (*People v. Cisewski* (1987), 118 Ill. 2d 163, 175-76, 514 N.E.2d 970.) Even where certain remarks are found to be improper, they will not be considered reversible error unless they constitute a material factor in the defendant's conviction or result in substantial prejudice to the accused, such that the verdict would have been different had they not been made. *Terry*, 99 Ill. 2d at 517.

Based upon the instant record, we hold that the prosecutor's remarks did not constitute a material factor in defendant's conviction or result in substantial prejudice such that the verdict would have been different had the comments not been made. Accordingly, the prosecutor's comments did not operate to deprive defendant of a fair trial.

We next address defendant's claim that the trial court abused its discretion in imposing consecutive sentences for the attempted murder and armed robbery convictions.

The State asserts that because defendant failed to object to the sentences imposed and did not raise this issue in his motion for a new trial, the issue has been waived on appeal. Yet, the Illinois Supreme Court has recently held that a defendant is not required to

file a post-sentencing motion in order to preserve sentencing errors for review on appeal. See *People v. Lewis* (1994), 158 Ill. 2d 386, 391.

Defendant contends that his sentences were excessive because he was only 16 years old when the offenses were committed, did not have an extensive criminal background, and had great potential for rehabilitation.

It is recognized that in considering the propriety of punishment a court of review must give great weight to the judgment of the trial court. (*People v. La Pointe* (1981), 88 Ill. 2d 482, 492-93, 431 N.E.2d 344; *People v. Perruquet* (1977), 68 Ill. 2d 149, 154, 368 N.E.2d 882; *People v. Bergman* (1984), 121 Ill. App. 3d 100, 110, 458 N.E.2d 1370.) The imposition of a sentence is a matter of judicial discretion and, absent an abuse of this discretion, the sentence of the trial court may not be altered upon review. (*Perruquet*, 68 Ill. 2d at 153.) Additionally, the trial judge is normally in a better position to determine the punishment to be imposed than is a court of review. *Perruquet*, 68 Ill. 2d at 154; *People v. Butler* (1976), 64 Ill. 2d 485, 490, 356 N.E.2d 330.

A reasoned judgment as to a proper sentence must be based upon the particular facts and circumstances of each individual case. (*Perruquet*, 68 Ill. 2d at 154.) Such a judgment depends upon many factors, including the gravity of the offense and the circumstances of commission, the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, age, and criminal history. (*Perruquet*, 68 Ill. 2d at 154.) The sentencing judge is charged with the difficult task of fashioning a sentence which would strike the appropriate balance between protection of society and rehabilitation of the offender. (*People v. Cox* (1980), 82 Ill. 2d 268, 280, 412 N.E.2d 541; *Bergman*, 121 Ill. App. 3d at 109.) Yet, the objective of restoring the offender to useful citizenship is to be accorded no greater consideration than that which establishes the seriousness of the offense. *People v. Waud* (1977), 69 Ill. 2d 588, 596, 373 N.E.2d 1; *Bergman*, 121 Ill. App. 3d at 109.

In sentencing defendant to consecutive terms of 28 years for armed robbery and 20 years for attempted murder, the trial judge stated that he had considered the evidence and arguments presented in aggravation and in mitigation, had considered the testimony of the witnesses, had considered the expression of sympathy for Kennedy by defendant, and recalled and considered the evidence presented at trial, including the evidence regarding defendant's attempt to escape from custody. The court also found credible the testimony of Dorrell Long presented by the State in aggravation. In addition, the court noted the requirements of section 5—8—4(a) of the Unified Code of Corrections, which provide that the court shall not impose

consecutive sentences for offenses which were committed as part of a single course of conduct during which there was no substantial change in the nature of the criminal objective, unless one of the offenses for which defendant was convicted was a Class X or Class 1 felony and the defendant inflicted severe bodily injury. (See 730 ILCS 5/5—8—4(a) (West 1992).) The court also determined that the defendant had the intent to kill Kennedy and attempted to execute his plan.

In sentencing defendant to a term of 28 years for armed robbery, the court specifically remarked that the defendant had inflicted extreme psychological terror on the victim during the armed robbery by repeatedly threatening to kill Kennedy and by ordering him to get into the trunk.

●6 In requiring that defendant's 20-year sentence for attempted murder run consecutive to the penalty imposed for the armed robbery conviction, the court stated that it believed defendant was "at war with society," indicating that consecutive sentences were necessary to protect the public from further criminal conduct by the defendant. (See 730 ILCS 5/5—8—4(b) (West 1992); *People v. Hicks* (1984), 101 Ill. 2d 366, 374-75, 462 N.E.2d 473.) The court stated that this conclusion was predicated upon consideration of the facts of this case, the incident involving Dorrell Long, defendant's attempt to escape from custody, and defendant's demeanor during the trial.

The trial court specifically explained the disparity between the sentences imposed upon defendant and those imposed upon codefendant Simmons.

The record before us establishes that the trial court was fully aware of defendant's age and his potential for rehabilitation. Yet, these considerations had to be balanced against the seriousness of the offense of which defendant had been convicted. Upon review of the record, we hold that the trial judge properly considered all relevant factors, including the rehabilitative potential of the defendant, in making his sentencing decision. Accordingly, we hold that the penalties imposed for the armed robbery and attempted murder convictions do not reflect an abuse of the trial court's discretion. See *People v. Younger* (1986), 112 Ill. 2d 422, 428, 494 N.E.2d 145.

Finally, we address defendant's claim that he was deprived of his right to a public trial by the trial court's order that a deputy sheriff seize a spectator's notes during the hearing on defendant's motion to quash his arrest. Defendant asserts that the trial court's seizure of the notepad and pen of the unidentified observer requires that he be granted a new trial or, in the alternative, a new hearing on the motion to quash arrest and to suppress evidence.

It is established that the right to a public trial guaranteed under the sixth amendment applies to pretrial suppression hearings. (*Waller v. Georgia* (1984), 467 U.S. 39, 81 L. Ed. 2d 31, 104 S. Ct. 2210.) Where a defendant has been deprived of this right by a closure of the proceedings against him, the error will not be considered harmless, and the defendant need not show that he was prejudiced thereby. See *Arizona v. Fulminante* (1991), 499 U.S. 279, 294-95, 113 L. Ed. 2d 302, 321, 111 S. Ct. 1246, 1257; *Waller*, 467 U.S. at 49 n.9, 81 L. Ed. 2d at 40 n.9, 104 S. Ct. at 2217 n.9.

The cases relied upon by defendant indicate that violations of the right to a public trial have been found where the trial court has closed the proceedings to the public, locked the courtroom doors, or excluded certain persons from the courtroom and where the amplification system in the courtroom was defective or deliberately shut off so that persons in the gallery were unable to hear the proceedings. These cases are, however, factually distinguishable from the case at bar and are not controlling here. Defendant has not cited any cases which hold that the confiscation of a notepad and pen constitutes a violation of the constitutionally protected right to a public trial.

The right to a public trial guaranteed by the sixth amendment is satisfied by the opportunity of members of the public to attend the trial and to report what they have observed. (*United States v. Hastings* (11th Cir. 1983), 695 F.2d 1278, 1284.) This right of access does not include the right to record the trial, and reasonable limitations upon the unrestricted occupation of a courtroom by members of the public are permissible. See *Hastings*, 695 F.2d at 1280-81.

•7 The record in the instant case reflects that the trial court did not close the courtroom or exclude anyone from the courtroom. There is no indication in the record that any member of the public was precluded from listening to or observing any portion of the hearing on defendant's pretrial motions. No part of the suppression hearing was closed from public scrutiny. Moreover, the trial court did not take any action to prevent any observer from leaving the courtroom at any time or from communicating to others what had transpired during the hearing on defendant's pretrial motion. Thus, the actions of the trial court did not transform the suppression hearing into a secret proceeding, as defendant claims. Accordingly, we hold that defendant is not entitled to a new trial or to a new suppression hearing based upon the trial court's confiscation of the observer's notepad and pen.

For the foregoing reasons, the defendant's convictions and sentences are affirmed.

Affirmed.

EGAN, P.J., and RAKOWSKI, J., concur.