THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MICHAEL ARMSTRONG, Defendant-Appellant.

First District (2nd Division)   No. 1—98—4278

Opinion filed December 29, 2000.

608

CAHILL, P.J., dissenting.

Rita A. Fry, Public Defender, of Chicago (Emily Eisner, Assistant Public Defender, of counsel), for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Janet Powers Doyle, and Nicole M. Wilkes, Assistant State's Attorneys, of counsel), for the People.

JUSTICE COUSINS delivered the opinion of the court:

Defendant-appellant, Michael Armstrong, and Wardell McClain, who is not a party to this appeal, were each charged with first degree murder pursuant to sections 9—1(a)(1) and (a)(2) of the Criminal Code of 1961 (720 ILCS 5/9—1(a)(1), (a)(2) (West 1998)), for the beating and burning of Richard Will. Armstrong was sentenced to 90 years in the Illinois Department of Corrections. On appeal, defendant argues that: (1) the trial court erred in denying his motion to quash arrest and suppress evidence; (2) counsel provided ineffective assistance of counsel by not moving to suppress statements under the fifth amendment (U.S. Const., amend. V); and (3) the trial court erred in sentencing him to an extended term of 90 years' imprisonment.

Prior to trial, Armstrong filed a motion to quash arrest and suppress evidence based upon a violation of his fourth amendment rights. The motion asserted that Armstrong was seized from his home without probable cause. The following facts were elicited at the hearing on that motion.

On October 18, 1995, at approximately 1 a.m., Officer Haynie of the Ford Heights police department stopped a vehicle and arrested the driver on an outstanding warrant. The vehicle's passenger, Richard Will, who was also the vehicle owner, was not allowed to drive his vehicle. Officer Haynie instructed Will to walk to a phone booth located approximately two blocks away to call someone to pick him up. Officer Haynie called for a tow truck and took the driver to the police station.

While at the station, Officer Haynie received a call that a man was being burned and beaten in the 1600 block of Berkley in Ford Heights. When Officer Haynie arrived, he observed that the victim was Will. The victim was lying in the street in the fetal position, he had been severely beaten, his hair was smoking, and there was a smoldering flame in his groin area.

At 8 a.m. on the same day, Officer Haynie told juvenile officer Donna Bankston that a man had been beaten and burned. At approximately 11 a.m., Officer Haynie was informed by Ford Heights police department dispatcher Sue Wright that there were numerous anonymous phone calls "stating that Michael Armstrong was involved in the burning of a white guy." Officer Bankston also received an anonymous phone call at approximately 2 p.m. on the 18th of October. She testified:

> "The subject on the phone had stated that a MA was involved with the beating and burning of *** the white guy that was burnt up. *** He stated that MA was Michael Armstrong who lived at 1600 Greenwood."

She stated that she did not recognize the voice of the caller.

Officer Haynie testified that on the morning of October 19, 1995, the Bloom Trail High School police liaison, Officer Haskins, called the police department and left a message that he wanted to see Officer Haynie. During their meeting, Officer Haskins told Officer Haynie that one of the students had come to him in confidence and told him that he spoke to "somebody else" who had spoken to "Stacy Pickens," who said that "Michael Armstrong did that shit." Officer Haynie then placed a phone call to Officer Bankston to have her locate Armstrong. Officer Bankston told Officer Haynie that Armstrong was already at the station.

In fact, on the morning of October 19, Officer Bankston went to the home of Armstrong. When Armstrong answered the door, Bankston asked him if his grandmother was at home and he responded that she was. Officer Bankston testified that defendant "called upstairs for his grandmother to come down, and she yelled down, she asked who was it, and he said it's Lady Red, which is me, Officer Bankston." Officer Bankston also testified:

> "I stated to her that I needed to talk to Michael and that I needed to bring him to the station to talk to me.
>
> She stated okay, it would be no problem as long as she knew he was with me. I told her I would bring him right back, I just needed to talk to him, and if anything occurred that I would give her a phone call.
>
> * * *
>
> I told her I was taking him to the Ford Heights Police Department."

Armstrong's grandmother testified at the suppression hearing, stating that "when I seen her they was getting in the car, the police car," and she denied ever speaking to Officer Bankston. Officer Bankston transported Armstrong to the police department in a marked police car. He was not handcuffed and was seated in the front seat of the police car.

Officer Bankston further testified that she and Armstrong entered the station through the front doors. At the police station, Officer Bankston read Armstrong his *Miranda* rights and his juvenile rights from preprinted forms. When Officer Haynie returned to the police station on October 19, he spoke with dispatcher Wright, who related that she received more anonymous calls stating that Michael Armstrong was involved in the burning.

The record indicates that Armstrong was interviewed by Officer Bankston in an open lounge at the police station. Officer Bankston asked Armstrong if he knew anything about the beating and burning of the victim. Armstrong told her, and later Officer Haynie and the as-

sistant State's Attorney, about his involvement in the beating and burning of Will. Armstrong relayed the following account:

"After midnight on October 18th, 1995, me and my friends went over to 16th and Berkely in Ford Heights which we called Vietnam. I was with Michael Evans, Wardell McClain, Lewis McDonald, Marvin Drummond, Keith Clinton and a guy named Marquis.

When we got to the corner, we saw this white guy running toward us from the Bronx which is near 17th and Ellis. We yelled at him freeze, we the police. Me and Mike grabbed the white guy out of the bushes and me and my friends jumped him.

We all punched and kicked him in his face and body. *** Wardell lit the guy's hair on fire with a lighter. Then Marvin poured some lighter fluid from a plastic bottle onto the white guy's body. Mike helped Wardell light the guy on fire again.

Before when Wardell lit the guy's hair on fire, we let the fire rise on the guy's head a little and everyone got a laugh out of it. Then I stomped the guy's head with my shoe and put the fire out. Then Mike and Wardell lit the guy up again while he was on the ground getting stomped. I knew they were gonna kill the guy when they did that again.

I left with Keith and we went to my house. All the other guys met up with us there except for Mike. Mike showed up later. I learned later from my grandmother that the guy died."

Officer Bankston then told Armstrong that he was under arrest. At the time of his arrest, Armstrong was 16 years old and resided in Ford Heights, Illinois, with his grandmother, Patsy Armstrong, his guardian. He was in the ninth grade and was receiving "special education."

The trial court denied Armstrong's motion to quash arrest and suppress evidence. Subsequently, the court found Armstrong guilty of two counts of first degree murder. He was sentenced to an extended term of 90 years' imprisonment for the murder.

As the reviewing court, we are asked to review several issues upon appeal. Armstrong first contends that his statements and fingerprinting should have been suppressed as the "fruits of an unlawful arrest without probable cause." We agree.

In denying defendant's motion to quash arrest and suppress evidence, the trial court stated:

"[I]t was brought out Haynie and Bankston are in effect working together, so the knowledge of one must be imputed to the other. The doctrine of People versus Peek and similar cases. Now, as far as the knowledge, well, the anonymous call by itself, that is a very simple issue. An anonymous, one anonymous call covered by the propositions and premises of People versus Paren and People versus Pitts and other similar cases, there isn't too much you can an officer can rely on one anonymous call.

> But I think we had more than one here, which constructively has been communicated both to Haynie and Bankston. That's the information not just from dispatcher Wright but also from Officer Haskins, who's not speaking to the so-called pigeons or police confidential informants, he's speaking to civilian students.
>
> So what we have here is more than just an anonymous call. So the officer I think was justified in going over there, either one of the officers, to Armstrong's house, and the grandmother tells Bankston okay."

■ However, in our view, the anonymous calls, even when combined, do not provide an indicia of reliability. In Illinois, information received by the police from third parties must be justified by some indicia of reliability in order to establish probable cause. *People v. Morris*, 229 Ill. App. 3d 144, 158, 593 N.E.2d 932 (1992). Probable cause is defined as facts and circumstances that would prompt a reasonable person to believe that an offense has been committed and that the accused committed the offense. *Morris*, 229 Ill. App. 3d at 158. Probable cause may be determined by the totality of the circumstances. *Illinois v. Gates*, 462 U.S. 213, 234, 76 L. Ed. 2d 527, 545, 103 S. Ct. 2317, 2330 (1983).

■ Here, Officer Bankston only knew the details of how the victim died, where he died, and the name given to her by one anonymous phone call. The information given to her in that anonymous call had no indicia of reliability. The fact that a "white guy" had been burned and beaten was readily available to members of the public. An uncorroborated tip by an informer whose identity and reliability are both unknown does not constitute probable cause to make an arrest. *People v. Parren*, 24 Ill. 2d 572, 576, 182 N.E.2d 662 (1962).

We also note that, when police officers are working in concert on an investigation, probable cause for an arrest may be established on information possessed by any of those officers. *People v. Holveck*, 171 Ill. App. 3d 38, 48, 524 N.E.2d 1073 (1988). However, even if the information from Officer Haskins to Officer Haynie may be imputed to Officer Bankston, the accusation against the defendant made by the unnamed student does not contain any more indicia of reliability than the anonymous phone calls.

We now turn to whether Armstrong was unlawfully seized. In denying the motion to quash arrest and suppress evidence, the trial court stated:

> "Now, the indicia of whether he was at that moment arrested or not, there is some—there is considerable indicia that he was not in fact under arrest.
>
> First of all, he was not handcuffed nor searched or even patted

down. And Bankston did testify that if he wasn't going to come, he or grandma said he wasn't coming, she would talk to him at home. I can't really say that the proposition as to the claim that he was arrested at his home has been supported or sufficiently supported by the greater weight of the evidence."

█ We disagree because these considerations by the trial court are not supported by the greater weight of the evidence. "The relevant inquiry in determining whether a suspect has been arrested is whether, under the circumstances, a reasonable person would conclude that he was not free to leave." *People v. Melock*, 149 Ill. 2d 423, 437, 599 N.E.2d 941 (1992).

Courts look at the following factors to evaluate whether a reasonable person in the defendant's position would believe himself to be in custody: (1) the location, mood, and length of interview; (2) the number of police officers present; (3) the presence or absence of the defendant's family or friends; (4) any indicia of formal arrest, such as physical restraint, the show of weapons or force, booking, or fingerprinting; and (5) the manner by which the defendant arrived at the place of the interview. *Melock*, 149 Ill. 2d at 440.

█ Moreover, custodial interrogations are seizures and require probable cause even though the "trappings of a technical formal arrest" may not be present. *People v. Wicks*, 236 Ill. App. 3d 97, 103, 603 N.E.2d 594 (1992). We hold that the actions of the officers in the instant case constituted an illegal seizure.

The following cases are instructive when a reviewing court is presented with facts that do not include the "trappings of a technical formal arrest." In *People v. Fitzpatrick*, 107 Ill. App. 3d 876, 438 N.E.2d 222 (1982), the issue on appeal was whether the trial court erred in denying the defendant's motion to suppress his written statement taken at the police station because the statement was the fruit of an illegal arrest. The trial court in *Fitzpatrick* found that the defendant was not involuntarily detained or arrested until after he had made the incriminating statement. *Fitzpatrick*, 107 Ill. App. 3d at 878. The appellate court, however, disagreed and held that the denial of the motion constituted error. *Fitzpatrick*, 107 Ill. App. 3d at 877. Similar to the instant case, the investigation in *Fitzpatrick* was focused on the defendant as a result of information received through an anonymous tip. In *Fitzpatrick*, as in the instant case, the defendant was not told that he need not accompany the officer to the police station. *Fitzpatrick*, 107 Ill. App. 3d at 879. The reviewing court in *Fitzpatrick* stated that although the defendant was not handcuffed, fingerprinted, or photographed, the circumstances indicated that the detention of defendant resembled a traditional arrest and that a reasonable person

would not have felt free to refuse the officer's request. *Fitzpatrick*, 107 Ill. App. 3d at 880.

A landmark case regarding unreasonable seizures is *Dunaway v. New York*, 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248 (1979). In *Dunaway*, a jail inmate awaiting trial for burglary supplied information to the police implicating the defendant in a murder and attempted robbery. Defendant was taken into custody, driven to the police station for questioning, and given his *Miranda* warnings. At the station, the defendant made incriminating statements. The Supreme Court reasoned that "seizures are 'reasonable' only if supported by probable cause." *Dunaway*, 442 U.S. at 214, 60 L. Ed. 2d at 837, 99 S. Ct. at 2257. Moreover, the Court held that the seizure of a citizen cannot be an " 'expedition for evidence.' " *Dunaway*, 442 U.S. at 218, 60 L. Ed. 2d at 839, 99 S. Ct. at 2259, quoting *Brown v. Illinois*, 422 U.S. 590, 605, 45 L. Ed. 2d 416, 428, 95 S. Ct. 2254, 2262 (1975).

A similar, although not identical, case to the instant case is *In re J.W.*, 274 Ill. App. 3d 951, 654 N.E.2d 517 (1995), in which the court applied the aforementioned principles in the juvenile context. In that case, a 14-year-old was called into the principal's office and when he arrived, there were three officers waiting for him. *J.W.*, 274 Ill. App. 3d at 952-53. They told him that they wanted to speak to him about a homicide and notified his grandmother, who, however, was not his guardian. *J.W.*, 274 Ill. App. 3d at 953. He was placed in the back of the police car, one officer sat in the back with him, his book bag was searched, and he was fed on the way to the police station. *J.W.*, 274 Ill. App. 3d at 953. The boy was taken to a large room where he was questioned while the door was left open. *J.W.*, 274 Ill. App. 3d at 953. The boy made incriminating statements while at the station. Those statements were admitted at trial despite defense counsel's motion to quash his arrest and suppress evidence. *J.W.*, 274 Ill. App. 3d at 956. Based on the defendant's age, the number of officers present, the method of questioning, the place of questioning, and the lack of any communication that he was free to leave, the appellate court held that a reasonable person in the boy's situation would not have felt free to leave and that the defendant's motion to quash his arrest and suppress evidence should have been granted. *J.W.*, 274 Ill. App. 3d at 961-62. The appellate court stated that "[i]t is well understood that interrogation at the police station is inherently coercive [citation], especially when a minor is involved." *J.W.*, 274 Ill. App. 3d at 960. The *J.W.* court also noted that "[h]aving been driven to the station, J.W. was in effect stranded there, buttressing the conclusion that a reasonable person in his situation would not have felt free to leave." *J.W.*, 274 Ill. App. 3d at 960.

■ A trial court's ruling on a motion to suppress is subject to reversal only if it is manifestly erroneous. *People v. Wheeler*, 281 Ill. App. 3d 447, 454, 667 N.E.2d 158 (1996); *People v. Steinberg*, 260 Ill. App. 3d 653, 656, 633 N.E.2d 142 (1994). The finding by the trial court in the instant case was against the manifest weight of the evidence. In the instant case, Armstrong's age, the lack of any communication that he was free to leave at any time, the anonymous tips to police, the absence of his grandmother, his lack of previous arrests, and his level of education all support the contention that he concluded that he was not free to leave. Therefore, we hold that defendant was under arrest while he was at the police station, prior to making his statements during interrogation.

Armstrong's final contention on appeal is that the trial court abused its discretion in sentencing him to 90 years' imprisonment. Armstrong additionally contends that the sentence imposed by the trial judge exceeded the prescribed statutory maximum and was impermissible under the fourteenth and sixth amendments of the United States Constitution (U.S. Const., amends. VI, XIV) and cites *Apprendi v. New Jersey*, 530 U.S. ___, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000). We agree that the enhanced sentence imposed is unconstitutional.

■ Initially, the State contends that Armstrong has waived his right to challenge the sentence by failing to raise the issue at the trial level. However, a defendant does not waive an appeal relating solely to sentencing issues for failure to seek sentencing reconsideration in the trial court. *People v. Lewis*, 158 Ill. 2d 386, 391, 634 N.E.2d 717 (1994); *People v. Jones*, 265 Ill. App. 3d 627, 638-39, 637 N.E.2d 601 (1994); *People v. Brown*, 267 Ill. App. 3d 482, 485, 641 N.E.2d 948 (1994). Moreover, Armstrong's challenge is of constitutional dimension. In Illinois, a constitutional challenge to a statute can be raised at any time. *People v. Bryant*, 128 Ill. 2d 448, 454, 539 N.E.2d 1221 (1989); *People v. Zeisler*, 125 Ill. 2d 42, 46, 531 N.E.2d 24 (1988). As the *Apprendi* Court stated, "constitutional protections of surpassing importance" are at stake:

> "[T]he proscription of any deprivation of liberty without 'due process of law,' Amdt. 14, and the guarantee that '[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury,' Amdt. 6. Taken together, these rights indisputably entitle a criminal defendant to 'a jury determination that [he] is guilty of every element of the crime with which he is charged, beyond a reasonable doubt.' " *Apprendi*, 530 U.S. at 476-77, 147 L. Ed. 2d at 447, 120 S. Ct. at 2355-56, quoting *United States v. Gaudin*, 515 U.S. 506, 510, 132 L. Ed. 2d 444, 449, 115 S. Ct. 2310, 2313 (1995).

See also *Sullivan v. Louisiana*, 508 U.S. 275, 278, 124 L. Ed. 2d 182, 188, 113 S. Ct. 2078, 2080 (1993); *In re Winship*, 397 U.S. 358, 364, 25 L. Ed. 2d 368, 375, 90 S. Ct. 1068, 1073 (1970). ("[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged").

Due process entitles a defendant to know with what he is charged and to have a fact finder make a decision finding those facts beyond a reasonable doubt. Here, there was no knowing waiver of that entitlement.

■ Another one of the defendant's contentions upon appeal is that his sentence is unduly harsh because "the State's own evidence contained statements of withdrawal from the group." We disagree with this contention. A case similar to the one at hand is *People v. Nunn*, 184 Ill. App. 3d 253, 51 N.E.2d 182 (1989). In that case, the eight defendants severely beat a middle-aged, unarmed man using various weapons. Two defendants admitted to participating in the beating, although they claimed that they walked away from the victim while the others continued their assault upon the victim. The court in *Nunn* held that simply walking away while the others continued their assault upon the victim did not constitute effective withdrawal. *Nunn*, 184 Ill. App. 3d at 272.

In the instant case, Armstrong did not withdraw before the crime was committed. In fact, the defendant did not withdraw until the victim had already been severely beaten and burned at least once. Armstrong did indeed leave before the group was finished attacking Will, but his exit did not constitute a timely withdrawal.

■ We will next address defendant's contention that the sentence imposed in the instant case must be set aside pursuant to the recent Supreme Court decision, *Apprendi*. In *Apprendi*, the defendant fired several shots into the home of an African-American family and was charged with second degree possession of a firearm for an unlawful purpose. *Apprendi*, 530 U.S. at 469, 147 L. Ed. 2d at 442, 120 S. Ct. at 2351. A New Jersey statute classifies the possession of a firearm for an unlawful purpose as a "second degree" offense punishable by imprisonment for 5 to 10 years. A separate statute, the state's "hate crime" statute, provides for an extended term, if a trial court finds, by a preponderance of the evidence, that the defendant acted with the purpose to intimidate an individual because of race, color, gender, handicap, religion, sexual orientation, or ethnicity. *Apprendi*, 530 U.S. at 469, 147 L. Ed. 2d at 442, 120 S. Ct. at 2351. The extended term authorized by the hate crime law for second degree offenses is imprisonment for 10 to 20 years. The issue before the Court was

"whether the Due Process Clause of the Fourteenth Amendment requires that a factual determination authorizing an increase in the maximum prison sentence for an offense from 10 to 20 years be made by a jury on the basis of proof beyond a reasonable doubt." *Apprendi*, 530 U.S. at 469, 147 L. Ed. 2d at 442, 120 S. Ct. at 2351. The Supreme Court answered affirmatively. *Apprendi*, 530 U.S. at 474, 147 L. Ed. 2d at 445, 120 S. Ct. at 2354.

The precursor to *Apprendi* is *Jones v. United States*, 526 U.S. 227, 143 L. Ed. 2d 311, 119 S. Ct. 1215 (1999). In *Jones*, the defendant was charged under a federal statute with "carjacking." The indictment made no reference to the statute's numbered subsections and charged none of the facts in the numbered subsections of the statute. *Jones*, 526 U.S. at 230, 143 L. Ed. 2d at 318, 119 S. Ct. at 1218. The Court held that "under the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt." *Jones*, 526 U.S. at 243 n.6, 143 L. Ed. 2d at 326 n.6, 119 S. Ct. at 1224 n.6.

The State argues that *Apprendi* does not apply for several reasons. First, the State contends that *Apprendi* does not apply to Illinois' first degree murder statute, as the elements are the same regardless of whether a defendant is facing the death penalty or an extended term. However, proceedings in Illinois capital cases are bifurcated. The defendant is entitled to have a jury find the facts that the State must prove in both phases. See 720 ILCS 5/9—1(a) through (g) (West Supp. 1999). Moreover, the Court in *Apprendi* explained that capital cases are not controlling:

> " 'Neither the cases cited, nor any other case, permits a judge to determine the existence of a factor which makes a crime a capital offense. What the cited cases hold is that, once a jury has found the defendant guilty of all the elements of an offense which carries as its maximum penalty the sentence of death, it may be left to the judge to decide whether that maximum penalty, rather than a lesser one, ought to be imposed .... The person who is charged with actions that expose him to the death penalty has an absolute entitlement to jury trial on all the elements of the charge.' " *Apprendi*, 530 U.S. at 497, 147 L. Ed. 2d at 459, 120 S. Ct. at 2366, quoting *Almendarez-Torres v. United States*, 523 U.S. 224, 257 n.2, 140 L. Ed. 2d 350, 377 n.2, 118 S. Ct. 1219, 1237 n.2 (1998) (Scalia, J., dissenting).

Second, the State contends that *Apprendi* is not applicable to the instant case because the trial court could have properly imposed a

sentence of natural life imprisonment after it found that the murder was accompanied by brutal and heinous behavior indicative of wanton cruelty. Specifically, the State cites the following language used by the trial court in sentencing Armstrong:

"Now, by way of aggravation, the offense was accompanied by exceptionally *brutal and heinous behavior indicative of wanton cruelty* and that, I suggest, is putting it mildly. The defendant will be and is sentenced to extended term of 90 years." (Emphasis added.)

However, Armstrong was not sentenced under the "natural life" sentence provision of the Unified Code of Corrections (730 ILCS 5/5—8—1(a)(1)(a), (a)(1)(b) (West 1998)). He was sentenced to a term of years pursuant to sections 5—8—2(a)(1) (730 ILCS 5/5—8—2(a)(1) (West 1998)) and 5—5—3.2(b)(2) (730 ILCS 5/5—5—3.2(b)(2) (West Supp. 1999)) of the Unified Code of Corrections.

The relevant sections of the sentencing code in the instant case are sections 5—8—1(a)(1)(a), 5—8—1(a)(1)(b), 5—8—2(a)(1), and 5—5—3.2(b)(2) (730 ILCS 5/5—8—1(a)(1)(a), (a)(1)(b), 5—8—2(a)(1), 5—5—3.2(b)(2) (West 1998 and Supp. 1999)).

Section 5—8—1 provides:

"(a) Except as otherwise provided in the statute defining the offense, a sentence of imprisonment for a felony shall be a determinate sentence set by the court under this Section, according to the following limitations:

(1) for first degree murder,

(a) a term shall be not less than 20 years and not more than 60 years, or

(b) if the court finds that the murder was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty or, except as set forth in subsection (a)(1)(c) of this Section, that any of the aggravating factors listed in subsection (b) of Section 9—1 of the Criminal Code of 1961 are present, the court may sentence the defendant to a term of natural life imprisonment." 730 ILCS 5/5—8—1(a)(1)(a), (a)(1)(b) (West 1998).

Section 5—8—2 provides:

"(a) A judge shall not sentence an offender to a term of imprisonment in excess of the maximum sentence authorized by Section 5—8—1 for the class of the most serious offense of which the offender was convicted unless the factors in aggravation set forth in paragraph (b) of Section 5—5—3.2 were found to be present. Where the judge finds that such factors were present, he may sentence an offender to the following:

(1) for first degree murder, a term shall be not less than 60 years and not more than 100 years[.]" 730 ILCS 5/5—8—2(a)(1) (West 1998).

Relative to factors in aggravation, section 5—5—3.2 provides:

"(b) The following factors may be considered by the court as reasons to impose an extended term sentence under Section 5—8—2 upon any offender:

\*\*\*

(2) When a defendant is convicted of any felony and the court finds that the offense was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty[.]" 730 ILCS 5/5—5—3.2(b)(2) (West Supp. 1999).

Contrary to the State's argument, we hold that, pursuant to *Apprendi*, the aggravating factors provided in section 5—5—3.2(b)(2) must be proved beyond a reasonable doubt.

Finally, the State places reliance on *McMillan v. Pennsylvania*, 477 U.S. 79, 91 L. Ed. 2d 67, 106 S. Ct. 2411 (1986), and *United States v. Dunnigan*, 507 U.S. 87, 122 L. Ed. 2d 445, 113 S. Ct. 1111 (1993). However, those cases are distinguishable.

In *McMillan*, the Court considered the constitutionality of Pennsylvania's mandatory minimum sentencing act under the due process clause of the fourteenth amendment and the jury trial guarantee of the sixth amendment. *McMillan*, 477 U.S. at 80, 91 L. Ed. 2d at 73, 106 S. Ct. at 2413. That statute provided that anyone convicted of certain felonies was subject to a mandatory minimum sentence of five years if the judge found by a preponderance of the evidence that the defendant "visibly possessed a firearm" during the commission of the offense. *McMillan*, 477 U.S. at 81, 91 L. Ed. 2d at 73, 106 S. Ct. at 2413. The *McMillan* Court reasoned that the Pennsylvania legislature had taken one factor that sentencing courts traditionally considered, the instrumentality used to commit the crime, and dictated the precise weight it was to receive. *McMillan*, 477 U.S. at 90, 91 L. Ed. 2d at 79, 106 S. Ct. at 2418. In *McMillan*, unlike here, the traditional sentencing factor merely raised the minimum sentence that may be imposed by the trial court. *McMillan*, 477 U.S. at 89, 91 L. Ed. 2d at 78, 106 S. Ct. at 2418. The Court concluded that the preponderance standard satisfied due process. *McMillan*, 477 U.S. at 91, 91 L. Ed. 2d at 80, 106 S. Ct. at 2419.

In *Dunnigan*, the question presented was whether the United States Constitution permits a court to enhance a defendant's sentence under the United States Sentencing Commission, Guidelines Manual § 3C1.1 (1989), if the court finds the defendant committed perjury at trial. The Supreme Court of the United States answered in the affirmative, stating that "[u]pon a proper determination that the accused has committed perjury at trial, an enhancement of sentence is required by the Sentencing Guidelines." *Dunnigan*, 507 U.S. at 98, 122 L. Ed.

2d at 456, 113 S. Ct. at 1119. The Court reasoned that a court's enhancement decision is sufficient where it makes a determination of an obstruction or impediment of justice that encompasses all of the factual predicates for a perjury finding. *Dunnigan*, 507 U.S. at 95, 122 L. Ed. 2d at 453-54, 113 S. Ct. at 1117. However, *Dunnigan* related to a sentence enhancement resulting from a defendant's trial testimony, not a traditional sentencing factor considered by a trial court.

Here, what is at issue is more than a sentencing issue. It involves whether a factor that affects a defendant's liberty has been proved beyond a reasonable doubt. This issue invokes fundamental constitutional rights under the fourteenth and sixth amendments of the United States Constitution (U.S. Const., amends. XIV, VI). The *Apprendi* case requires that any fact that enhances a sentence must be found by a reasonable jury. Indictments must set forth facts to be charged and defendants are entitled to have such facts tried by a jury. Without this, the sentence cannot be extended beyond the statutory limitations of 60 years in the instant case. See *Apprendi*, 530 U.S. at 473-74, 147 L. Ed. 2d at 445, 120 S. Ct. at 2354.

For the foregoing reasons, we reverse the trial court's denial of defendant's motion to quash arrest and suppress evidence, vacate the 90-year extended-term sentence, and remand for further proceedings.

Reversed in part and vacated in part; cause remanded.

GORDON, J., concurs.

PRESIDING JUSTICE CAHILL, dissenting:

I respectfully dissent from the conclusion that defendant was unlawfully arrested at his home. I would affirm the finding of the trial court that defendant was not arrested until he confessed to the crime at the police station. The majority reliance on *In re J.W.*, 274 Ill. App. 3d 951, 654 N.E.2d 517 (1995), eases my burden. I adopt the reasoning (and some of the zeal) of the dissent of Justice DiVito in that case, which relies on *People v. Williams*, 164 Ill. 2d 1, 645 N.E.2d 844 (1994).

The record here makes clear that whatever the trial judge said about the encounter between Officer Bankston and defendant at defendant's home, the ruling before us is that defendant was not placed under arrest until after he made a statement at the police station. The majority quotes a statement of the trial judge about the events leading up to the arrival of Officer Bankston at defendant's home, as if the threshold issue in this case is whether Officer Bankston had probable cause to arrest defendant at his home. But all the trial court said was that the officer was justified in going to defendant's

home. The court made no finding that there was probable cause to arrest at that time. I agree with the majority that anonymous phone calls, lacking indicia of reliability, cannot support probable cause to arrest, but given the trial court finding that no arrest took place at defendant's home, the discussion is irrelevant.

Our supreme court has adopted a *de novo* standard of review for the ultimate question of whether a confession is voluntary (*In re G.O.*, 191 Ill. 2d 37, 49-50, 727 N.E.2d 1003 (2000)), but has left the standard of review for factual findings firmly in place. Great deference is given to the trial court's factual findings, which are to be reversed only if they are against the manifest weight of the evidence. *In re G.O.*, 191 Ill. 2d at 50. These factual findings must include the resolution of disputed testimony. See *People v. Sigafus*, 42 Ill. 2d 26, 28, 244 N.E.2d 175 (1969). The trial court found, based on Officer Bankston's testimony, that defendant was not handcuffed, searched or patted down and that Bankston would have interviewed defendant at home if defendant chose not to go to the station. That should have been the end of the matter, unless we are prepared to explain, based on the record, why the trial court's factual findings were against the manifest weight of the evidence. To do this under the standard of review that binds us, we must make a finding that Officer Bankston's testimony was less credible than the testimony that conflicts with it and explain our reasons for doing so based on the record.

I respectfully dissent.